FILED & JUDGMENT ENTERED
David E. Weich

Jan 23 2009

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

In Re:                          )
                                )
**MARCIA Y. BURTON,**           )
                                )    Case No. 08-00301
                                )    Miscellaneous Proceeding
            Respondent.         )
                                )
_____ )
                                )
In Re:                          )
                                )
**CHARMAINE HERNANDEZ**         )
                                )    Case No. 07-31579
                                )    Chapter 7
                                )
            Debtor.             )
                                )
_____ )

### MEMORANDUM OPINION AND ORDER

This matter was originally before this Court upon (1) the
Bankruptcy Administrator's ("Administrator") Motion for
Disgorgement of Fees, Motion for Sanctions, and Motion to Review
Attorney Status dated January 9, 2008; (2) the Bankruptcy
Administrator's Supplement to his Motion filed April 18, 2008
(together, the "Omnibus Motion"); and (3) the Responses thereto
filed by Marcia Burton, Esq. ("Burton") filed May 8, 2008. Misc.

Proc. No 08-00301. After several continuances, an evidentiary hearing was held on June 16, June 19, and June 20, 2008.

Then, on July 7, 2008, the Administrator filed a Motion to Show Cause against Burton in the Charmaine Hernandez case. Ex Parte Motion to Show Cause, Case No. 07-31579 (No. 18), July 7, 2008. An evidentiary hearing on that motion was conducted on August 22, 2008.

Because the two motions involve common parties, facts and legal issues, these contested matters were consolidated for decision.

In each hearing, Burton was represented by Terry Sherrill, Esquire. The Administrator, John Bramlett, represented the Administrator's office.

### STATEMENT OF POSITIONS

The Administrator finds fault with Burton's conduct in twelve recent debtors' cases. He maintains Burton is guilty of (a) improper fee practices and (b) failing to properly represent her clients in accordance with the Bankruptcy laws, this Court's Local Rules, and the North Carolina Rules of Professional Conduct ("RPC"). The Administrator seeks an order requiring Burton to disgorge her attorney's fees in these cases. He also asks that she be suspended from practice before this Court.

The Hernandez motion contains similar allegations, plus an allegation that Burton failed to advise Hernandez of the

financial management course requirement of 11 U.S.C. §727(a)(11). According to the motion this caused Hernandez's case to be closed without a discharge. Finally, the Administrator maintains that Burton failed to reopen Hernandez's case to file the certificate so that Hernandez might receive her discharge.

Burton admits quite a number of the Administrator's factual assertions, including her practice of accepting post-petition fees from debtor clients. However, Burton blames her missteps on several different factors: unawareness that her conduct was improper; errors by her staff; and finally, an alcohol problem.

Burton generally denies misrepresenting her clients and dismisses the Administrator's assertion that she is unfit to practice bankruptcy law. Should this Court find the Administrator's allegations credible, Burton argues that she has received treatment for her alcohol problems and alleviated related problems. Burton also says she has significantly improved her practice skills since the Omnibus Motion was filed.

As to the Disgorgement Request, Burton maintains that she has refunded all unearned attorneys fees to her clients.

**HOLDING:** Based upon the evidence presented and after a post-hearing review of the dockets and filings in these bankruptcy cases, it appears that the Administrator's Motions are well taken. Burton has repeatedly violated the bankruptcy

laws; Local Rules of this Court; and the RPC. She has also committed malpractice on a broad scale in her clients' cases.

However, the evidence presented by the two sides about the amount of fees collected, earned and any sums refunded to clients was particularly weak. On the present record, no conclusion can be reached as to whether sums are owing to the clients. An accounting will be necessary to make this determination.

Finally, the clients' malpractice claims asserted in their testimony are beyond the scope of the present Sanctions Motions. These claims are denied, but without prejudice to the debtors raising them in a subsequent lawsuit. Consequently, the Omnibus Motion should be **GRANTED IN PART** and **DENIED IN PART**. Further, Burton has failed to justify her several failures to act on Hernandez's behalf. Between the two motions; the number and severity of misdeeds found in these cases; and the fact that a prior sanctions order has failed to produce more responsible conduct by this attorney, an augmented sanction will be imposed.

## FINDINGS OF FACT

Marcia Burton opened her bankruptcy practice in late 2004. A sole practitioner, counsel learned bankruptcy law on the fly. Four years later, Burton has filed well over a hundred consumer debtor cases in this judicial district.

From the beginning, there have been problems associated with Burton's cases. Counsel has been the recipient of literally dozens of case deficiency notices, a number of show cause citations, and at least one serious sanction order.

Experience has not lessened the frequency of these problems. Rather, they have been a constant aspect of Burton's practice. They only appear to have increased in gravity over time.

Most recently, the Administrator began to get calls in early 2008 from Burton's clients. These individual debtor complaints had several common themes: Burton left matters undone in their cases; Burton was unavailable to her clients; Burton failed to appear at hearings; and client cases were dismissed due to inaction. The Administrator investigated these complaints and found them credible.

The Omnibus Motion was filed in response to these complaints. The Motion identifies a dozen different debtors and the problems experienced in their cases. At hearing, several more such cases were discussed in the testimony.

Of these, clients Cureton, Silva, McDougle, Peete and Hernandez testified at the evidentiary hearings. We will consider their cases first.

### A.    JACQUELYN CURETON

Jacquelyn Cureton ("Cureton") developed cancer, missed work and fell behind on her mortgage. In September 2007, lender Chase Home Finance LLC commenced foreclosure proceedings against her home.

A few days later, Cureton received a form letter from Burton that promised relief through bankruptcy. Cureton responded to the solicitation. After speaking to Burton by phone Cureton made an office appointment. Burton advised Cureton of the financial information she would need to bring.

At a conference held September 27, 2007, Burton reviewed Cureton's financial information and told the client that the house could be saved with a Chapter 13 bankruptcy. Burton explained how Chapter 13 worked and quoted Cureton a $650 "flat fee" for the case. Another $308 would be needed for filing and credit briefing fees.

Facing loss of her home, Cureton was interested. Burton had her client sign a representation contract. Cureton paid Burton $200 of her fee on the spot. Burton offered to finance the remainder of the fees with Cureton, allowing Cureton to make direct installment payments to Burton. Burton prepared an invoice describing these payment terms. Cureton was not given

copies of either the contract or the invoice, ostensibly because Burton's copier was broken.[1]

Cureton left the conference understanding that Burton would immediately file her bankruptcy case. Burton denies that they had such an understanding. Counsel maintains that she would not agree to file a case where the upfront payment ($200) was less than the filing fee. Rather, Cureton was required to pay her more money and provide additional paperwork before the case would be filed. Burton claims to have telephoned Cureton a week after their conference to ask why these items had not been supplied and to warn that the case would not be filed until Cureton made further payments.

Cureton's account is the more credible of these diametrically opposed stories. Unlike Burton's story, Cureton's account is supported by extrinsic documentary evidence.

Four days after the meeting, Burton sent Cureton a letter referencing her "Bankruptcy Matter." In that letter dated October 1, 2007, Burton thanked Cureton for "giving her the privilege of representing you in **your current case.**" (emphasis added). Ten days later, Burton wrote Cureton a second letter. This letter advised Cureton that her bankruptcy case had been filed. Obviously, Burton's letters clearly demonstrate an unconditioned promise to file Cureton's bankruptcy filing.

---

[1] There is no indication in this record that Burton sent these documents to her afterward.

Burton now says these letters were sent in error; however, there is no corroboration of her suggestion.

As to Burton's assertion that she would not have agreed to file a case for such a small initial payment, this is far from certain. Many bankruptcy attorneys will file Chapter 13 cases with only a small upfront payment. These attorneys collect the balance of their attorneys' fees from the debtor's plan distributions.

While most attorneys prefer to get some portion of their fee upfront, Burton employs very unusual fee and filing practices that make a low upfront fee feasible: collecting fees from debtors after bankruptcy; filing minimal documents in their cases; and abandoning cases without notice where the installment payments are not made.

Burton's October 11, 2007, letter to Cureton highlights these practices. Anticipating an incomplete filing, counsel advises Cureton that she may receive a notice of deficiency from the Court. Burton deems these notices "customary." Burton further advises these deficiencies will not result in dismissal of the case, "provided you [Cureton] make at least one additional payment on your account with this office within 15 days of this notice."[2]

---

[2] Burton testified that this was a form letter used earlier in her practice. She says she previously ceased using this letter, based on advice of Christina Ackerman, a staff attorney for the Chapter 13 Trustee. Ackerman, however, testified that she had never seen this letter and that she never

Similarly, in offering Cureton an installment payment plan, Burton's preprinted invoice threatens additional attorney's fees, withdrawal (from the representation) or even dismissal of the client's case if payments to the attorney are not made. This same invoice would be used in other debtor cases and appears a staple of the practice.

Between Cureton's testimony, these two letters and Burton's fee practices, it seems more likely than not that the initial understanding was that the bankruptcy case would be filed immediately. And even if Burton's account is correct, having sent the client two letters referencing a bankruptcy case, at a minimum, counsel left Cureton with a reasonable belief that she was in fact in a bankruptcy case. Unfortunately, Burton never filed Cureton's case.

After receiving the two letters, Cureton heard nothing more about her case through the month of October. Since she was not actually in bankruptcy, no stay protected her assets. Cureton's home was sold at foreclosure on November 8, 2007. The ten (10) day upset bid period ran on November 18, 2007.

Cureton was unaware of these events, at least through the point of sale. She learned of the foreclosure sale either during the upset bid period or when she received a notice to vacate the property in mid December. Burton believes it was the earlier

gave Burton this advice. With no stake in these proceedings, Ackerman is the more credible witness.

date; Cureton, the latter. On this record, one cannot say for sure. However, it does not matter, given that no bankruptcy case was ever filed by Burton for the client.

Whatever the date, Cureton was shocked to learn of the foreclosure. She frantically attempted to contact Burton, making several unsuccessful calls and leaving messages on Burton's office and cell phones. Cureton was not able to reach Burton; however, she eventually got through to a member of Burton's office. Cureton was told that Burton was out of the office at the moment. However, the staffer reassured Cureton that Cureton's bankruptcy case had in fact been filed. Burton's office even provided Cureton with a case number.

Uncomforted, Cureton continued her efforts to speak to Burton. Despite several more attempts by phone and by email, Cureton was still unsuccessful. She did, however, manage to get through again to Burton's office. During this second telephone conversation with Burton's office, Cureton was told that she would need to pay Burton another installment payment before her bankruptcy case could progress. Cureton complied with this demand, paying Burton $300 on November 20, 2007. Burton's office accepted that payment, only to later inform Cureton that she had brought the money too late for them to file her bankruptcy case.[3]

---

[3] It is this testimony that gives the impression that Cureton may have learned of the foreclosure earlier than December; and likely late in the upset bid period.

Cureton lost her home and was forced to move. She incurred several thousand dollars of expenses in the process.

Burton eventually 'refunded' the $500 of attorney's fees paid by Cureton. However, the refund was made only after the Omnibus Motion had been filed and only then when Cureton's new attorney threatened Burton with a malpractice suit.

### B.   JERRY G. MCDOUGLE (Case No. 07-31910; Case No. 08-30199)

As of September 2007, Jerry McDougle ("McDougle") was facing foreclosure of his home. He was also behind on his truck payments. Like Cureton, McDougle got a Burton solicitation letter in the mail that promised aid in saving his home. He called Burton to make an appointment.

On Saturday, September 15, 2007, McDougle met with Burton at her office. After reviewing his situation, Burton told McDougle he needed a Chapter 13 case.  She quoted him a fee of $958, inclusive of filing fees. Burton agreed to partially finance McDougle's fees. The client was to pay her $500 up front and then make bi-weekly payments on the balance.  McDougle paid Burton the $500 initial payment that same day[4]. He was given a receipt but not a copy of his contract.

McDougle spent most of that Saturday at Burton's office as she worked up his petition. Twelve days later, on September 27,

---

[4] In McDougle's statement of financial affairs, Burton says the amount paid was $650, not $500.

2007, Burton electronically filed a Chapter 13 petition for McDougle.

This was a "barebones" petition. Under the Bankruptcy Rules, a party is permitted to file a petition containing only the most essential financial documents. <u>See</u> FED. R. BANKR. PROC. 1007(b). This filing initiates the case and invokes the protections of the section 362 automatic stay ("Stay"). The debtor is then afforded another fifteen days to complete and file the remainder of the case documents. FED. R. BANKR. PROC. 1007(c).

The Clerk of Court issued a deficiency notice advising McDougle/Burton of the missing case documents. Notice of Deficient Filing, Case No. 07-31910 (No. 2), Sept. 28, 2007. Burton filed McDougle's remaining case documents but did so after the filing deadline. These documents were required by October 12, 2007, but were not filed until October 15, 2007. While a three-day delay might appear immaterial, during that three day period McDougle's case was subject to being dismissed. It is only happenstance that the case survived.

McDougle and Burton disagree about the amount and timing of the fee payments that McDougle paid Burton in this bankruptcy case. Although he was hazy on the specifics, McDougle thought he paid Burton $230 on four or five separate occasions, including making one post-petition payment. McDougle says he usually

delivered these payments to Burton's office, but on one occasion, Burton came to McDougle's work place to pick up a fee installment. McDougle maintains he made these payments in cash, except for his final payment, which was made by check.

Burton counters by arguing that she received $500 from McDougle at their September 15, 2007, conference; a $225 payment a week later; and a $233 payment on September 27, 2007, the day she filed his petition. The last payment was the fee installment that Burton picked up at McDougle's workplace.

It is difficult if not impossible to reconcile the disagreement on this record. No one produced source document evidence (such as receipts or canceled checks) at these hearings,[5] so we must rely on the parties' unsupported statements.

At least as to pre-petition payments, Burton's version appears credible. The payments to which she attested total $958, the sum agreed to by the two sides at their September 15, 2007, conference. Burton's account also explains why a lawyer would drive to a client's workplace to obtain a fee payment; she wanted the money before she filed McDougle's case later that evening. Whether counsel collected more monies from McDougle after bankruptcy is anyone's guess. As we will see below, Burton

---

[5] For reasons that defy explanation, the Administrator did not subpoena Burton's bank or other financial records. Thus, in many of these cases, we have only the attorney's and the debtors' unsupported accounts of what was paid and when.

made such collections a routine part of her practice. However,
she denies collecting any more money from McDougle in connection
with this (first) case, and apart from the debtor's parole
statement, there is nothing to show otherwise.

A second disagreement in the testimony relates to
McDougle's credit briefing. The 2005 Bankruptcy Abuse Prevention
and Consumer Protection Act ("BAPCPA") requires individuals
contemplating bankruptcy receive a consumer credit briefing
before their petition is filed. 11 U.S.C. §109(h) (2008).
McDougle's petition represented that he had received this
briefing before bankruptcy, but stated he was not yet in
possession of the confirming certificate issued by the briefing
agency. <u>See</u> Voluntary Petition Under Chapter 13, Case No. 07-
31910 (No. 1), Sept. 27, 2007; Official Form 1, Ex. D (10/06).

The issue is whether McDougle actually sat for that
briefing.  Burton says McDougle received his credit briefing in
her office, by Internet using her computer. Burton maintains
that she walked McDougle through his briefing.[6] However, McDougle
flatly denies this assertion. He says Burton never told him
about the briefing requirement, and he did not sit for a
briefing in either this, or in his second bankruptcy case that
Burton filed.

---

[6] Typically, these Internet briefings involve a series of informational
screens through which the user scrolls.

Of the two accounts, the debtor's statement is the more credible. First of all, McDougle was quite certain that he had not taken the briefing. He had no reason to lie about this point.[7]  Second, the extrinsic evidence contradicts Burton's account.

When Burton filed the balance of McDougle's petition documents, the agency certificate was a part of the submission. That document does in fact indicate that a pre-petition Internet briefing was conducted under McDougle's name. The issue is when that briefing occurred and whether McDougle participated.

According to Burton, McDougle received his briefing, with her assistance, during their September 15, 2007, office conference. The agency certificate contradicts her statement, in that it reflects a briefing that occurred on September 27, 2007, twelve days later.

September 27, 2007, was of course the date the bankruptcy was filed. It fell on a Tuesday. The only evidence of a meeting between counsel and McDougle on that date was Burton's account of having gone to McDougle's workplace to pick up her fee payment. There is no suggestion in the evidence that McDougle and Burton met later that night at her office for this purpose.

Making the possibility that McDougle actually sat for his briefing even more remote, the agency certificate indicates

---

[7] As seen below, both of McDougle's Burton-filed cases had been dismissed by the time of this hearing.

McDougle's briefing occurred at 11 p.m. The court docket reflects that Burton electronically filed McDougle's petition, with the representation that he had received his briefing at 11:43 p.m., a mere 43 minutes later. Putting aside the date problem, for Burton's account to be even partially true, McDougle would have had to have been physically present at her office taking his briefing and helping her finalize his petition at 11 p.m. on a Tuesday night. There is no suggestion by either party that this is what happened.[8]

It is a far more likely scenario that having collected the balance of her fee from McDougle during the workday, Burton spent the evening completing and filing McDougle's barebones petition. Burton appears to have "taken" McDougle's Internet briefing in order to generate an agency certificate with a pre-petition date.[9] Then, despite knowing that McDougle had not met the prerequisite for filing (and possibly without even his signature on a printed petition), Burton electronically filed McDougle's case, thereby staying foreclosure of his home.

The problems in McDougle's petition did not end there. Success of the Chapter 13 plan Burton prepared for McDougle depended on valuing his home and avoiding a second mortgage and

---

[8] McDougle is a middle-aged man who "details" cars for a living. He does not appear to have the technical knowledge to take the Internet course on his own.
[9] Without a pre-petition briefing, the case would have been dismissed, without more. See In re Baxter, Order Denying Motion to Reconsider Order Dismissing Case, Case No. 06-30452 (No. 18), May 17, 2006. (Bankr. W.D.N.C. 2006).

a lien on his real property. Chapter 13 Plan, Case No. 07-31910 (No. 9), Oct. 15, 2007.  The idea was to reduce secured debt and thereby lower McDougle's monthly payments to an affordable level.

Unfortunately, Burton's proposed plan was technically and financially unconfirmable. The Clerk issued another deficiency notice pointing out the error. See Court Notice of Defective Filing, Case No. 07-31910 (No. 10), Oct. 16, 2007. Two months, three continued first meetings, and three amendments of the plan by Burton failed to fix the proposed plan.

On December 26, 2007, the Chapter 13 Trustee objected to confirmation due to a lack of feasibility. He moved to dismiss the case for unreasonable delay.[10]

Upon receipt of the Trustee's motion to dismiss, McDougle began frantic attempts to contact his attorney. Like many other Burton clients, he was unable to reach her.  Worse, Burton did not file a response to the Trustee's motion to dismiss. She did not even contact her client to discuss the matter.

Counsel did appear at the January 29, 2008, dismissal hearing; however, she made no attempt to oppose the motion. Apparently she intended to immediately file another case for

---

[10] The problems associated with the original plan were clearly Burton's fault. On this record, one cannot ascribe fault with the subsequent amendments. Burton testified that a previously unknown tax claim made the plan untenable. She says the only way to free up enough money to "float" the plan was for McDougle to surrender his truck to the lender. He refused to consider her suggestion. Whether Burton should have discovered the tax claim before the case was filed is open to question.

McDougle, a very important step that had not been communicated
to McDougle nor authorized. McDougle's case was dismissed. <u>See</u>
Order Dismissing Bankruptcy Case, Case No. 07-31910 (No. 26),
Jan. 31, 2008.

For his part, McDougle was unaware of this dismissal until
the lender repossessed his truck. Shocked, he again attempted to
contact Burton all night long.  When McDougle reached Burton,
she told McDougle that she would contact the Trustee and call
McDougle back.  She did not.

McDougle then physically went to Burton's office and sat in
her lobby until she appeared. Burton then advised McDougle he
would need to pay her an additional $294 filing fee so she could
file a second Chapter 13 case on his behalf. McDougle had little
choice but to accede to her demand.[11]

On that day, February 1, 2008, Burton filed a second
Chapter 13 petition for McDougle. <u>See</u> Voluntary Petition Under
Chapter 13, Case No. 08-30199 (No. 1), Feb. 1, 2008.

If Burton felt any remorse about McDougle having to refile,
it did not show. Burton sought a full rate Chapter 13 attorney
fee of $3,250 in the new case. Of course, counsel already had
McDougle's petition in her computer.  It should have been
possible to refile McDougle's case with only a few amendments.

---

[11] Burton testified McDougle suggested filing the second bankruptcy case, a
statement that is entirely unbelievable.

Even so, no credit was given for the sums previously paid to counsel in the last case.

At this point, counsel had all of McDougle's prior petition documents by this point in her software. Nevertheless, Burton filed the second case as a barebones petition. This partial filing would come back to haunt McDougle.

Of course, being another barebones petition, the second case drew another deficiency notice. On February 22, 2008, Burton submitted the missing documents, six days after the deadline. Once again McDougle's case had been unnecessarily subjected to the risk of dismissal.

The problems continued. McDougle's creditors' meeting was held on March 20, 2008. Burton was not present. McDougle, however, was in attendance and surprised at his attorney's absence. With no attorney nor a proposed plan that required amendment, the Trustee felt compelled to continue McDougle's creditors' meeting.[12]  The creditors' meeting was reset for April 8, 2008, but on the condition that Burton amend McDougle's plan and file another missing case document, the Debtor's Local Form 7, Debtor's Certification and Affidavit.[13]  <u>See</u> 341 Proceedings Memorandum, Case No. 08-30199 (No. 10), Mar. 24, 2008.

This scene was repeated at the April 8, 2008 continued first meeting. The Trustee and McDougle were again in

---

[12] The Trustee could have submitted the case for dismissal at that point.
[13] This local form contains several required representations by the debtor concerning the status of taxes, wages and any domestic support obligations.

attendance.   Burton again failed to appear. The debtor's Local
Form 7 was still missing, and the Plan had not been corrected.
The Trustee again continued the first meeting, this time to
April 22, 2008.

At the April 22, 2008, first meeting, Burton was once again
absent. Another attorney attempted to stand in for McDougle, who
again was in attendance. However, with all of these
deficiencies, the case could not proceed.   McDougle's second
case was dismissed on April 29, 2008.

Burton's decision to refile McDougle's Chapter 13 case was
to seek recovery of the truck repossessed after dismissal of
McDougle's first case. Nothing in the docket from this second
case reflects any effort by counsel to help McDougle reclaim his
vehicle.

### C. RICKY PEETE (Case No. 07-32204)

Like McDougle, Rickey Peete ("Peete") was also behind on
his mortgage and car payments.   He found Burton by consulting
the attorney advertisements in the telephone directory. Peete
and his wife met with Burton about filing a bankruptcy petition
somewhere between late September and October, 2007.

After reviewing Peete's situation, Burton recommended that
he file a Chapter 13 case. She would handle his case for a $900
"flat fee," inclusive of filing fees.   Peete and Burton agreed
to an installment payment plan that contemplated a $200 upfront

payment and subsequent installment payments against the $700 balance. Burton filed Peete's case on November 8, 2007.

Peete says he paid Burton the $200 plus two further payments of unknown amounts before his case was filed. He paid Burton the remaining balance after bankruptcy, with Burton's active encouragement. Burton wrote Peete a dunning letter after bankruptcy in order to collect a final $81 payment.

Of course, Burton tells a different tale. She testified that Peete paid her $400 on October 18, 2007, plus $558 on November 7, 2007, for a total of $958, meaning all of her fee was paid before bankruptcy.

Again we have an attorney-client fee dispute over with no supporting financial documentation to corroborate either party's testimony. It appears reasonable to believe that the parties contemplated Peete making direct fee payments to Burton after bankruptcy. Further, Burton acknowledges that she sent Peete the post-petition collection letter; so obviously, her testimony that the fee was entirely paid before bankruptcy is false. At least some part of the fee was contemplated after the filing. Finally, it is undisputed that Burton made a practice of taking post-petition debtor payments.

Nor would the parties' financial arrangement be accurately disclosed in Peete's bankruptcy petition. Peete's Statement of Financial Affairs indicates that Peete paid Burton $650 in

attorney's fees before bankruptcy.  The Response shows a single payment occurring on October 15, 2008 rather than two payments occurring on October 18, 2008 for $400 and November 7, 2008 for $558. Burton's dates and amounts do not match themselves, much less Peete's testimony.

Despite having quoted Peete a "flat fee" of $900 for his Chapter 13 case, Burton proceeded to seek an additional $2,600 fee from Peete's Chapter 13 Plan payments. See Chapter 13 Plan, Case No. 07-32204 (No. 7), Nov. 26, 2007.

The fact that Burton put Peete in a Chapter 13 case at all is surprising. Chapter 13 debtors must have sufficient regular monthly income to cover their living expenses and to make plan payments to existing creditors. Peete had lost his job shortly before bankruptcy. At the petition date, he was employed as a "temp."  Meanwhile, Peete's wife was unemployed. Due to the Peete's lack of income, at best, Peete was a marginal candidate for Chapter 13.

Peete's financial situation quickly worsened. Three weeks after bankruptcy, Peete lost his temp job.  Peete    informed Burton of this job loss prior to his December 26, 2007, creditors' meeting.

The feasibility of a debtor's plan is normally dependent upon his employment. Thus, trustees routinely ask debtors about changes in their employment status at creditors' meetings. Even

so, Burton instructed Peete not to tell the Chapter 13 trustee that he had lost his job.

Sure enough, during the meeting, the Trustee asked Peete about his employment status. Peete did as Burton instructed: he lied. Peete testified under oath at the creditors' meeting that he was still employed with the temp agency.

Peete's false statement about his employment enabled him to confirm his Chapter 13 plan. See Order Confirming Plan, Case No. 07-32204 (No. 16), Jan. 17, 2008. And while counsel told her client that they would deal with the unemployment issue after the creditor meeting, they did not. Neither he nor Burton ever apprised the Trustee or this Court of the true facts.

Of course, lacking a supporting income, Peete's plan was doomed to failure. The debtor missed his first two monthly mortgage payments. By March 2008, Peete's lender was seeking relief to resume its foreclosure on the home that Peete had hoped to save in bankruptcy. See HSBC Motion for Relief from Stay, Case No. 07-32204 (No. 19), Mar. 3, 2008.

Peete could not reach his attorney for advice. Worse, Burton did not interpose a response or objection on Peete's behalf. Peete's lender was given permission to resume its foreclosure. See Order Granting Motion for Relief From Stay, Case No. 07-32204 (No. 20), Mar. 26, 2008.

Even then, Peete hoped to salvage something. By late April, Peete had secured a buyer for his home and obtained his lender's consent to a "short sale." A closing date had been set for May 22, 2008. <u>See</u> Correspondence, Case No. 07-32204 (No. 23), May 15, 2008.

Unfortunately, Peete was all but on his own. Despite his requests, Burton had not filed the necessary motion to sell or noticed the matter to creditors. Worse, Peete was again unable to reach Burton by phone.

Facing a June 11, 2008, foreclosure sale, Peete was almost out of time. He resorted to self-help. Peete mailed a letter to the Clerk of Court, requesting an emergency hearing and authority to sell his home. <u>Id</u>.

Peete's letter was received on May 15, 2008. The very same day, Burton filed her own Motion to Sell Peete's house. <u>See</u> Motion to Sell Property, Case No. 07-32204 (No. 21), May 15, 2008. Burton says she had been working on this sale all along, and it was happenstance that both motions were received on the same date. Burton says her relationship with Peete had become strained. Therefore, rather than talking to her client, Burton says she was communicating with Peete's realtor. Burton further represented that she only discovered Peete's pro se motion when she filed her own motion.

Burton's story does not pass muster. Apart from being entirely self-serving, it is farfetched. Peete had a contract to sell his home by April 15, 2008. His lender's consent to sale was in hand by April 26, 2008. With a closing set for May 22, 2008, a foreclosure sale on June 12, 2008, and given the need for court approval upon notice,[14] Burton knew swift action was required. Even so, Burton delayed nineteen days before filing the sale motion. When she did act, the May 15th motion filing date was so late that it all but precluded a closing by May 22, 2008, as required in the sale contract.

Few lawyers would intentionally wait to file a motion until a date that precipitates their client's breach of contract. It would also be a strange coincidence that both sale motions would be filed on the same day, if that is what occurred. Neither possibility is very likely. Rather, Burton failed to act until Peete tendered his own request. When Burton learned of this request, she felt compelled to act, filing her own motion.

Fortunately for all, the closing date was delayed; notice of the motion was shortened, and at a May 27, 2008, hearing, the sale was approved. Ironically, Burton requested a $350 fee at hearing for prosecuting this sale motion.[15]

---

[14] Per Bankruptcy Rule 2002(a)(2) and 6004, a proposed sale requires a twenty-three day notice to all creditors, unless the time period is shortened for cause.
[15] Unaware of the attendant circumstances, this Court approved the fee request.

Unfortunately for Peete, the sale did not resolve all of his financial problems. Three days afterward, the Chapter 13 Trustee moved to dismiss Peete's case due to plan payment defaults. See Trustee's Motion to Dismiss Case or Modify Plan for Failure to Make Plan Payments, Case No. 07-32204 (No. 27), May 30, 2008. Peete then lost his Ford Explorer to repossession. See Order Granting Relief from Stay, Case No. 07-32204 (No. 40), Aug. 11, 2008.

Having lost the two assets that he hoped to save through bankruptcy, Peete threw in the towel. His case was voluntarily converted to a Chapter 7 liquidation on August 15, 2008.

### D. JULIO AND BETH SILVA (Case No. 06-31663)

Burton filed a Chapter 13 petition for Julio and Beth Silva on October 11, 2006. This was a true emergency filing. The Silva's home had been sold at foreclosure and they were in the upset bid period when they contacted Burton. Their bankruptcy filing occurred on the last day of that upset bid period.

In an office conference preceding the filing, Burton quoted the Silva's a fee of $650 for handling their case. The Silva's paid $300 of the sum up front. Burton took their post-dated check for the $350 balance.

Burton deposited the Silva's check on the same day that she filed their case. The check bounced. Burton thereafter called Beth Silva and proposed that the Silva's pay her the balance of

her fee in cash at their upcoming creditors' meeting. The Silva's did so.

The Silva's filing was another marginal Chapter 13 case. It took two Court deficiency/defective notices, three continued first meetings and several months to get the petition completed, all necessary documents (i.e. tax returns) turned over to the Trustee, and a plan confirmed.

Unfortunately, that plan was unfeasible. Confirmation was quickly followed by payment defaults. By September 2006, the Silva's mortgage lender had obtained permission to reinstate its foreclosure against the Silva's home. See Order Granting Motion for Relief from Stay, Case No. 06-31663 (No. 27), Sept. 11, 2007.

A new group of problems arose when, in November 2007, Beth Silva totaled her car. That loss was insured and the insurer offered a settlement. Silva hoped to use the $6,700 of these funds to purchase a replacement vehicle. However, creditor Triad held an $8,000 lien on Silva's car, and the insurer would not disburse these funds directly to the debtor.

This is a common problem for Chapter 13 debtors, but one easily resolved. Silva needed a motion to substitute collateral to permit use of the insurance proceeds to purchase a new car and transfer Triad's lien to Silva's new vehicle.

Silva contacted Burton in January 2008, and gave her the insurance company's contact information. Burton agreed to prepare the necessary paperwork. Unfortunately, afterward, Silva could not get Burton to act; nor could she reach her attorney to discuss the matter. Over ensuing months, Silva unsuccessfully tried to call her attorney on a number of occasions. Like other Burton debtors, Silva's calls were received by an answering machine. Silva had to leave messages for her attorney. Her calls were not often returned, and on those occasions when they were returned, the response was unsatisfactory. On one occasion Silva was told that Burton was on medical leave.[16] Another voice mail reply to one of her inquiries promised a response later in the week. That response never came. Nor did a substitution motion.

Meanwhile, Silva was paying to rent a car. Finally, Silva contacted the Chapter 13 Trustee to ask him what to do. At his suggestion, Silva reported her problems to the Administrator.

In the end, it was the Chapter 13 Trustee who filed Silva's substitution motion, not her attorney. <u>See</u> Motion of Trustee for Review of the Status Claim of Triad Financial Corp. and the Possible Use of the Triad Cash Collateral by the Debtors, Case No. 06-31663 (No. 29), Feb. 25, 2008. A hearing on the motion was held on March 25, 2008. Finding Burton had been unresponsive

---

[16] Burton acknowledged that while she was in an alcohol treatment center, during March 2008, her office told clients she was on medical leave.

to her client, Judge Hodges allowed the Trustee's substitution
motion for the Debtor. See Order Authoring Debtor's Use of Cash
Collateral, Case No. 06-31663 (No. 30), Mar. 18, 2008. It also
fell to the Trustee to prepare the Debtor's substitution Order
as well. See id.

A follow-up hearing was held on April 15, 2008 to resolve
any remaining issues about the replacement vehicle selected. See
id. Ironically, having failed to prepare her client's motion
(and order) or to attend the two earlier substitution hearings,[17]
Burton showed up at the April 15, 2008, hearing. See Order
Satisfying Motion for Review of Status of Claims, Case No. 06-
31663 (No. 36), Apr. 17, 2008.

A couple of other improprieties about the Silva's petition
need be mentioned. The Silva's Certificate of Credit Briefing
indicates a credit briefing that was received on the filing
date, October 11, 2007. Like McDougle's case, the section 109(h)
requirement that the briefing occur at least one day before the
filing was ignored.  Thus, the Silva's were ineligible to file
bankruptcy on the petition date.

A second petition problem relates to the fees and fee
disclosure. The Silva's had contracted with Burton for a $650
total fee for handling their case. They were not made aware that
Burton intended to collect additional sums through their plan.

---

[17] It would later be learned that Burton was in an alcohol treatment program
on the hearing date. See infra Part L.  Counsel did not advise the client or
seek to have another attorney cover the hearing for her.

Burton's attorney's fee disclosure form filed in the case seeks a base fee of $3,000, less $600 previously collected, or $2,400 to be paid out of the plan.

Apart from seeking sums greater than those agreed to with the Silva's, the attorney fee disclosures in the petition are inaccurate.  The petition discloses a single $600 client payment made on the filing date, October 11, 2006. See 13 Fee Disclosure/Local Form 3, Case No. 06-31663 (No. 10), Oct. 26, 2006. Actually, the Silva's paid Burton in two payments, not one. The date of the payments was also incorrect. The $300 cash payment was made on October 9, 2006, not on the 11th. The total amount was also incorrectly reported. Counting the NSF check, the payments totaled $650, not the $600 Burton disclosed. Finally, the 9th question in the Statement of Financial Affairs asks about payments in the year before bankruptcy. Since the Silva's check bounced before these Schedules were filed, Burton was aware that the Silva's had paid her only one pre-petition payment of $300. She also knew that she had contracted to receive a post-petition replacement payment of $360. This fact was not disclosed either.

### E. TONYA McCRAY (Case No. 07-31479)

Tonya McCray ("McCray") was a Burton debtor client who also became her employee. On July 25, 2007, Burton filed a Chapter 13 petition for McCray and her husband, Sean.

During visits to Burton's office McCray noticed phones that were frequently ringing and left unanswered. McCray pointed this fact out to Burton and asked about a part-time job as a receptionist.  McCray was hired.  She worked for her attorney from January 1, 2008, until February 15, 2008.

During her employment, McCray observed that Burton was often overextended and short staffed, which meant clients could not reach Burton.  To compensate for this, Burton gave several clients her personal mobile telephone number and e-mail address.

McCray further testified that, after ending her employment in February 2008, she too experienced difficulty when contacting Burton about her Chapter 13 case.

McCray was behind on her mortgage payments at the petition date.  Three months into her case, the lender sought relief from stay to foreclose.  See Motion for Relief from Stay, Case No. 07-31479 (No. 17), Oct. 3, 2007.  Burton failed to respond on the McCray's behalf, and on October 23, 2007, the lender was permitted to seek foreclosure.

Burton finally responded two weeks later, seeking reconsideration of the relief from stay order.  Burton's motion acknowledged that her failure to respond was her fault, a lapse she terms "computer error."  See Motion for Reconsideration, Case No. 07-31479 (No. 19), Nov. 5, 2007.

After several hearings, the lender consented to the McCray's catching up their payments. See Consent Order Settling Motion for Reconsideration, Case No. 07-31479 (No. 25), Jan. 31, 2008. The McCray's attempted to make these payments but could not. On May 28, 2008, the lender gave notice of default. This default released the lender to foreclose on the McCray's home.

After this "time bomb" order exploded, Tanya McCray called Burton several times, hoping to propose alternate payment arrangements with her lender. Each time McCray was unable to reach Burton. Eventually McCray reached Burton, if only by e-mail. McCray advised her attorney of the payment default and of the creditor's refusal to speak with her directly. Burton promised to contact the lender; however, she failed to do so. Despite several subsequent e-mail messages from McCray requesting information, Burton failed to respond. In fact, at hearing Burton produced a copy of an e-mail message from Mrs. McCray that, although sent days earlier, was opened for the first time in the courtroom. By this point, the McCray's had had enough. They changed attorneys.

### F. CHARMAINE HERNANDEZ (Case No. 07-31579)

Charmaine Hernandez ("Hernandez") was behind on her car payments and facing eviction from her apartment due to missed rent. She contacted Burton about a bankruptcy case.

During a meeting at Burton's office on August 7, 2007, Burton recommended a Chapter 7 case to Hernandez. Burton quoted Hernandez a fee and offered to take installment payments. Hernandez accepted the proposed arrangement. In total, Hernandez paid Burton the $1,333 inclusive of filing and credit briefing fees. Some portion was paid after bankruptcy. Burton prepared and then electronically filed her case two days later, on August 9, 2007.

Hernandez recalls the August 7, 2007, office conference as being short. She was presented with and signed a representation contract and an installment payment agreement. Hernandez says she was not given copies. Hernandez also does not recall whether she either saw or signed her bankruptcy petition before it was filed.[18]

Burton's decision to put Hernandez in Chapter 7 as opposed to Chapter 13 was strange given that the debtor was behind on both her car payment and her rent. Chapter 7 is not typically selected for debtors who wish to cure payment defaults and to retain leased and encumbered property.[19]

---

[18] The possibility that Hernandez may not have signed, or even reviewed, her petition before her Chapter 7 case was filed is very troubling, particularly since Burton was previously sanctioned for this practice. See infra Part VII. However, Hernandez's testimony was too hazy to support a finding to this effect.

[19] In order to assume a lease, the debtor must first cure (catch up) any rent defaults. See 11 U.S.C. §365. Most debtors cannot do this, at least not in a lump sum.

The fact that Chapter 7 was ill suited to Hernandez's needs was proven when her car lender sought permission to recover her car. See Motion for Relief from Stay, Case No. 07-31579 (No. 9), Oct. 16, 2007. Even then, a cure might have been negotiated with the lender. However, Burton again dropped the ball.

As a CM-ECF user and Hernandez's counsel of record, Burton received electronic notice of the Best Buy motion the same day it was filed. This District permits such motions to be noticed on a "no object" or "negative notice" basis. A written response must be filed by the debtor by a date certain to trigger a hearing. Otherwise, the motion is granted.

Unfortunately, for Hernandez, Burton failed to file a response, and Best Buy was given relief from stay. See Order Granting Motion for Relief from Stay, Case No. 07-31579 (No. 10), Nov. 13, 2007. Best Buy repossessed Hernandez's vehicle.

Hernandez contacted Burton to tell her about the repossession and was reassured by Burton that she would "take action" to recover the car.

Two weeks later, Burton sought reconsideration of the relief from stay grant; once again asserting that her failure to respond to the motion was due to computer error. Burton further

---

With secured debts, if there is nonexempt equity in the property, the Trustee will attempt to sell it. If not, the automatic stay is soon released (11 U.S.C. §362(c)). Absent ability to redeem the collateral for cash or the lender's consent to reaffirm the obligation, the debtor is again facing repossession or foreclosure.

alleged, and incorrectly, that Hernandez was current on the debt.

While the reconsideration motion was short on legal justification, it did put the matter back in court and afforded another opportunity to save Hernandez's vehicle.

Best Buy was represented by counsel at the December 13, 2008, hearing and ready to contest Burton's motion. However, even though Burton had selected and calendared this hearing, she failed to appear. Her reconsideration motion was denied. See Order Denying Motion for Reconsideration, Case No. 07-31579 (No. 13), Dec. 18, 2008. Hernandez was not at the reconsideration hearing either, given that Burton had not informed Hernandez about the filed motion or the hearing date. Hernandez never did get her SUV back.

Adding to her woes, Hernandez's case was then closed without a discharge. No certificate had been filed by counsel in her case to evidence completion of the personal financial management instruction course required by section 727 and Interim Bankruptcy Rule 1007(b)(7). See Final Decree and Order Closing Case without Discharge, Case No. 07-31579 (No. 14), Dec. 18, 2007. In fact, Hernandez testified she had not been informed by Burton of this case requirement. Burton says otherwise. Burton claims to have told Hernandez about the financial management requirement during their initial conference

35

as well as at the September 12, 2007, first meeting of creditors.

There is no way to know what Hernandez may have been told by her attorney about bankruptcy given their short and hurried initial conference. Given the numerous instances in this record where Burton failed to perform a necessary act on behalf of her debtor clients, this Court is inclined to accept Hernandez's statement as the truth.

Even if Burton did tell Hernandez about the financial management requirement at that conference, there is no suggestion that this information was provided to the client in writing so that Hernandez might remember the need to take this post-petition course. And, even by Burton's account, she did nothing to follow up on her client's compliance with the requirement.

When Hernandez received the Final Decree and realized that she had not been granted a discharge, she called the Bankruptcy Court. She spoke to a deputy clerk about the matter who told her that she should refer the matter to her attorney. Hernandez did so, leaving several text and voice mail messages on Burton's cell phone. Her calls were not returned.

Nothing was forthcoming from Burton for six months. Then, with the Administrator's Omnibus Motion in Court, Burton sent Hernandez an email, stating:

> [M]otion paperwork is attached. There was [a] question
> about the date the financial management course was
> taken. We believed that it was taken within the
> deadline and filed it that way. Actually it was
> outside the 45 day window but due to the delay i(sic)
> had decided to pay the reopen fee of 260 out of my
> pocket just to get things speeded up." Omnibus
> Objection Hearing, Burton email dated June 19, 2008,
> Ex. A.

Late beats never, so this email had to be welcome news to Hernandez. Regrettably, Burton's email representations to this client were entirely false. As of June 10, 2008, counsel had not filed a certificate for Hernandez with this Court. Nor had she sought to reopen the case file, a necessary prerequisite to filing that certificate. Nor had Burton paid the reopening fee as represented in the email.[20] Burton would never, then or later, perform any of these tasks.

In attempting to explain this email from the witness stand, Burton said that she did not feel responsible for Hernandez's failure to get a discharge. However, since the matter had been drug out so long, she offered to pay the reopening fee and had prepared a motion to do so. She did not file it only because Hernandez hired replacement counsel.

Counsel's explanation, advanced six months after the closing of Hernandez's case, is not credible.

---

[20] The case was reopened a month later, on July at the behest of the Administrator. See Motion to Reopen Bankruptcy, Case No. 07-31579 (No. 17), July 7, 2007.

When alerted to the need to take the course (by entry of the Final Decree), Hernandez took the financial management course on December 27, 2007, making Burton's failure to act even more inexcusable. Thus, there was no impediment to Burton reopening the case to secure the client's discharge for the next six months.

Hernandez finally got her discharge just prior to the continued hearing on this matter, in August 2008. However, she has only the Administrator to thank for that, not her attorney. Sympathetic to Hernandez's plight, the Administrator reopened the case. Burton had nothing to do with it.

Meanwhile, having lost her vehicle, Hernandez was forced to lease a car. She had been renting for four or five months at the date she testified. Additionally, Hernandez gave up her apartment and relocated to Asheville, N.C. She says she is unable to rent another apartment in her name due to her bankruptcy filing. She missed several days of work trying to get her case straightened out and in attending these hearings.

### G. CALVIN AND VICTORIA SCOTT (Case No. 07-32151; Case No. 08-30078)

On December 26, 2007, Victoria Scott contacted the Administrator complaining about Burton's conduct in her and her husband, Calvin's, Chapter 7 case.

The Scotts had met with Burton on two occasions in October 2007, to discuss and then to prepare a Chapter 7 filing. The

38

Scotts paid Burton $500 before bankruptcy. Most of this sum went towards the filing fee. However, Burton agreed to permit the Scotts to make installment payments on their $833 balance.

The Scotts were unable to make these fee payments before bankruptcy due to a pending garnishment order against Mr. Scott's wages. See Response/Objection, n.32, Misc. Proc. No. 08-00301 (No. 10), May 9, 2008.  The fee agreement between the debtors and Burton contemplated fee payments after bankruptcy. Burton's Response says this was to help the Scotts. See Response/Objection, n.23, Misc. Proc. No. 08-00301 (No. 10), May 9, 2008.

Burton filed the Scotts' case on November 2, 2007.  This was another barebones petition, lacking most of the required case documents. On November 5, 2007, the Clerk issued a notice of deficiency listing missing documents and advising that failure to timely file the same would subject the case to dismissal. The notice was electronically served on Burton, but the missing documents were not filed. The Scotts' case was dismissed on November 25, 2007.

One of the missing petition documents was the Scotts' Credit Briefing Certificate. The petition Burton prepared for the Scotts averred that the Scotts had obtained their Credit Briefing certificate before bankruptcy. See Voluntary Petition Under Chapter 7, Exhibit D - Individual Debtor's Statement Of

Compliance With Credit Counseling Requirement, Cases No. 07-32151 (No. 1), Nov. 2, 2007.

This representation was false, and Burton's filed response to the Omnibus Motion admits as much. <u>See</u> Response/Objection, n.24, Misc. Proc. No. 08-00301 (No. 10), May 9, 2008. Here, Burton argues she only learned of the Scotts' failure to obtain a credit briefing when she "entered the number," meaning the certificate number. <u>See</u> Response/Objection, n.26, Misc. Proc. No. 08-00301 (No. 10), May 9, 2008. Exactly when Burton allegedly learned of this misrepresentation is not stated in her Response, but presumably it was after bankruptcy.

Burton's statement suggests without any extrinsic evidence that the Scotts faked their credit briefing, and "ginned up" a false briefing number. In short, Burton suggests that her clients perpetrated a fraud on the Court.

However, several facts belie her accusation. First, Burton admitted that the Scotts paid her the fee for the credit briefing course. This payment indicates that the Scotts were going to take the briefing though Burton's office, not independently.

Second, Burton's story presumes without any support that these two lay people knew enough about the new bankruptcy credit briefing procedures to make up a certificate (1) in the name of an agency approved for this judicial district and (2) containing

40

a certificate number that would pass muster. It also presumes a fraudulent act by the Scotts without any underlying motive. The story is dubious, at best.

However, even if Burton's statements were true, Burton still prepared and filed a petition for the Scotts containing a false statement made under oath. See Voluntary Petition Under Chapter 7, Exhibit D - Individual Debtor's Statement Of Compliance With Credit Counseling Requirement, Cases No. 07-32151 (No. 1), Nov. 2, 2007. If, as she says, Burton learned of the true "facts" about the briefing after bankruptcy; she still did nothing to correct the misrepresentation or to alert the Court of the false statement. No amendments were made to the petition. The Court was not alerted to the misrepresentation. In short, Burton either made, or permitted her clients to make, a false statement under oath in the Scotts' bankruptcy case.

As to why the Scotts' barebones petition was not completed, in her Response, Burton blames her debtors. Burton maintains the Scotts failed to provide her with the necessary financial information to complete these case documents.

Because this particular scenario (a barebones filing followed by a failure to complete the petition) is so common in Burton's practice,[21] the Court is skeptical about her statement. The fact that Scott would appear at multiple hearings prepared to testify against her attorney on these matters suggests that

---

[21] See infra Part K(2).

Scott at least, did not think the Scotts were responsible for the dismissal.

That, of course, does not prove the point, but another piece of circumstantial evidence suggests that it was not the Scotts' indifference that led to dismissal but Burton's. The Scotts paid Burton $200 of her attorneys fee on November 23, 2007, two days before their case was dismissed. It is unlikely that the Scotts would be so motivated that they would pay their attorney, while simultaneously so lackadaisical that they would not provide the financial information necessary to complete their petition and make their payment meaningful.

Six weeks after the case was dismissed, Burton filed a second Chapter 7 case for the Scotts. See Voluntary Petition Under Chapter 7, Case No. 08-30078 (1), Jan. 14, 2008. Although required, Burton failed to disclose the Scott's earlier Chapter 7 case in this second petition. The Clerk's office picked up the Scotts' prior bankruptcy, and the Scotts were ordered to appear in Court to explain the omission. See Order Directing Debtor to Appear and Show Cause for Failure to Disclose a Previous Filing, Case No. 08-30078 (No. 6), Jan. 18, 2008. The Scotts dutifully attended that hearing held February 11, 2008. Even though it was her error that precipitated that show cause hearing, Burton failed to appear at the hearing to represent the Scotts.

Burton was then being ordered to appear and show cause for failing to attend the earlier hearing. See Court Order for Debtor's Attorney to Appear and Show Cause, Case No. 08-30078 (No. 11), Feb. 13, 2008. After several continuances, that hearing was later folded into the present proceedings. However, in these hearings Burton did not satisfactorily explain her absence at the Scott's February 11, 2008 hearing or the failure to list their prior case in the second petition.

### H. ALICE ROSS (Case No. 06-40024; Case No. 07-40598)

On January 24, 2006, Burton filed a Chapter 13 petition for Alice Ross ("Ross"). On October 8, 2007, she voluntarily dismissed her client's case, only to refile the Ross case ten days later. See Voluntary Petition Under Chapter 13, Case No. 07-40598 (No. 1), Oct. 18, 2007. The purpose of the refiling is not entirely clear, although it appears to be an attempt to undo a relief from stay order[22].

A Chapter 13 debtor is required to begin plan payments within thirty days of the filing. See 11 U.S.C. §1326. At the time of Ross's creditors' meeting, two months into her second case, the Trustee had received only one payment from Ross. Ross informed the Shelby Division Chapter 13 Trustee, Stephen Tate,

---

[22] On October 10, 2007, Creditor Carolina Finance was given relief to repossess the debtor's car, after Burton withdrew her client's response. The reason for the withdrawal was lack of client information to support an objection. See Withdrawal of Response/Objection, Case. No. 06-40024 (No. 32), Aug. 31, 2007. Despite this, a month later, Burton refiled the Ross's case, and proposed a second plan treating Carolina Financial as a secured creditor, albeit at a $2,100 lower level than in the first case.

that she had paid her two plan payments to Burton's office at
the outset of her second case.  According to the Omnibus Motion,
during a subsequent conversation with the Trustee's staff,
Burton's office acknowledged possession of Ross' payments and
promised to forward the funds to the Trustee.  When the funds
were not forthcoming, the Trustee sought an accounting and
turnover of the payments from Burton.  See Motion for Accounting
and Turnover, Case No. 07-40598 (No. 12), Feb. 14, 2008.

That turnover motion was calendared for hearing on February
29, 2008 before Judge Hodges. Burton did not appear at the
hearing,[23] causing Judge Hodges to issue a show cause order
directing Burton to appear; to produce an accounting of funds
paid to her by the debtor and to turn over any funds held on her
client's behalf. That order warns, "If the debtor's attorney
fails to appear at the hearing on March 28, 2008, the court will
consider sanctions up to and including disbarment from the
practice of law in this court. In addition, the court will
notify the North Carolina State Bar about these matters." See
Order to Show Cause, Case No. 07-40598 (No. 16), Mar. 5, 2008.

Judge Hodges continued the original show cause hearing to
April 25, 2008. See Order Continuing Show Cause Hearing, Case
No. 07-40598 (No. 17), Mar. 6, 2008.  The undersigned held court
in Shelby for Judge Hodges on April 25, 2008. Burton did appear.

---

[23] It would later be learned that this was the date that Burton checked in at
an alcohol treatment facility.

The matter was again continued until May 19, 2008, presumably so that the missing monies could be investigated. In May, counsel failed to appear. With the Omnibus Motion headed for court, that show cause matter was also wrapped into the Omnibus Motion hearings.

At an August 29, 2008, hearing before Judge Hodges, the Trustee announced a settlement of the turnover matter. The summary order entered September 5, 2008 does not reveal whether counsel was in fact holding any client monies.

Neither Tate nor Ross were present at the June 2008, evidentiary hearings. Burton testified at that time that she had received no plan payment monies from Ross. In the absence of any evidence to the contrary, we must accept her testimony.

Burton gave no satisfactory explanation for her failure to seek a continuance of the February 29, 2008, accounting hearing or to advise other parties, including her client, that she was not planning to attend that hearing.

### I. CHARLES AND BLONDELL ROBINSON (Case No. 07-32205)

Burton filed a Chapter 13 case for Charles and Blondell Robinson on November 8, 2007. The Robinsons' case was later selected for random audit by the U.S. Office of Audit pursuant to 28 U.S.C. §586(f)(1). The auditor's notice was electronically served on Burton the same day it issued, November 26, 2007. That

45

notice required the Robinsons to provide a variety of financial documents to the auditors for review. They did not.

On January 25, 2008, the Audit Office filed a report in this case, indicating that the debtors had not complied with their document requests and that this made an audit impossible. It would take an order by Judge Hodges to the debtors and Burton and a hearing to obtain compliance with these audit requests. See Order Setting Status Hearing, Case No. 07-32205 (No. 36), Feb. 13, 2008.

Burton blames her clients in this situation, saying that the Robinsons failed to provide her with the necessary financial documentation. The Robinsons did not testify in these hearings, so there is no contrary evidence. However, it is also clear that counsel never responded to the auditors to advise them that she was having trouble getting information from her clients. Nor did she seek additional time from this Court for the Robinsons to make their production.

### J. OTHER BURTON DEBTORS

In addition to the aforementioned debtor clients, at least two others, Calvin Scott and Alice Ross, appeared in court at the earlier hearings prepared to testify in support of the Administrator's motions. Unfortunately, between Burton's alcohol treatment, her desire to obtain counsel, and then his need for

time to familiarize himself with the case, these hearings had to be continued several times.

By the time evidentiary presentations were begun in June, Scott and Ross were unavailable to testify due to work commitments. This is regrettable, particularly given their prior efforts to attend these hearings.

However, Burton did testify as to most of the debtor cases listed in the Motions. At least we have heard her side of these matters. Additionally, we can consider as evidence (1) matters appearing of record in these cases and (2) those facts admitted by Burton in the pleadings.

### K.  MISSED FIRST MEETINGS

Another matter raised in the Omnibus Motion was Burton's propensity to miss creditors' meetings. Such meetings are mandated by statute, and being necessary to case administration, the debtor's attendance is required. 11 U.S.C. §341.

As noted above in section B, on March 20, 2008, Burton failed to appear at Jerry McDougle's creditors' meeting. She also missed two other creditors' meetings scheduled for her clients that day: Eugene and Brendolyn Houston, Case No. 08-30246, and Terrence Durham, Case No. 08-30305.

Trustee's counsel Christine Ackerman ("Ackerman") was conducting the creditors' meetings on that date. Ackerman testified that Burton's clients were alarmed by their attorney's

absence.  The  clients  had  tried  to  reach  Burton  before  their meetings,  only  to  be  told  by  Burton's  office  that  she  was  on medical leave. In  Burton's  absence  these  cases  could  not proceed.   The  Trustee  continued  the  meetings.   Each  debtor missed work to no good purpose.

It  would  later  be  learned  that  Burton  was  in  an  alcohol treatment  facility.   She  had  been  there  for  three  weeks,  but neither  her  clients  nor  the  Trustee  had  been  apprised  of  this fact. No  one  was  told  that  Burton  did  not  intend  to  appear  at the  meetings,  and  counsel  did  not  seek  continuances  of  the  341 meetings from the court.

This  scene  was  repeated  two  weeks  later,  on  the  April  8 continued  creditors'  meeting  date.   Each  debtor  was  present. Burton,  now  out  of  treatment,  did  not  appear.  No  one  had  been informed  that  Burton  did  not  intend  to  appear.  No  continuances of  the  meetings  had  been  sought.  Again,  everyone  other  than Burton was inconvenienced.

Counsel's  failures  to  attend  her  clients'  creditors' meetings  subjected  each  of  these  cases  to  a  risk  of  dismissal. The  fact  that  their  cases  were  not  dismissed  was  entirely  due  to the  sympathy  of  the  trustees  for  the  unrepresented  debtors.

### L. GENERAL PRACTICES

From  the  evidence  presented  in  connection  with  these debtors'  cases  at  these  hearings  and  Burton's  own  testimony,  a

clear picture emerges as to counsel's unorthodox bankruptcy practices.

### 1. Solicitation & Debtor Enlistment

Burton finds many of her clients by reviewing state court foreclosure lists and mailing the borrowers solicitation letters. These letters, in rather inflammatory style,[24] promise homeowners that with Burton's services, they can save their homes. A free consultation is offered.

When a homeowner responds, Burton conducts a telephone interview with the person to gauge their financial situation. Then, at a follow up office conference, counsel reviews the client's finances in greater detail.  Burton then advises the client whether she believes a bankruptcy filing will aid them, and if so, whether a Chapter 7 or a Chapter 13 case would be best. She also quotes a fee for handling the client's bankruptcy case.

Assuming the client wishes to go forward, Burton has the prospective debtor sign a preprinted legal services contract and a fee agreement. If time permits, the client is sent home with worksheets and other document/information requests to complete. In a follow up visit, this information is incorporated into the petition and schedules. The case is then filed.

---

[24] In the Cureton solicitation letter, Burton extols the prospective client to avoid being "swindled by vultures seeking to take [your] home," meaning the foreclosing lender.

## 2. Barebones Petitions

A complete bankruptcy petition consists of a dozen plus documents that collect information about every aspect of a debtor's finances. See 11 U.S.C. 521; FED. R. BANKR. PROC. 1007. Assimilating this information is time consuming.

Due to repossession and/or foreclosure activities, some individuals need to file bankruptcy before the entire petition can be completed. The bankruptcy laws accommodate such emergencies by permitting debtors to file bankruptcy petitions containing only the most essential financial information to initiate the case. Upon filing this barebones petition, the automatic stay is invoked. Then the debtor, or rather his attorney, is afforded an additional fifteen days to complete and file the remaining petition documents. See FED. R. BANKR. PROC. 1007(c).

Barebones petitions are not uncommon, but most attorneys prefer not to use them.[25] Burton, by contrast, files almost all of her bankruptcy cases as barebones petitions.

Between January 1, 2006, and February 29, 2008, Burton filed fifty-nine Chapter 7 cases in this district. In 42 of the 49 cases (86%), a deficient filing notice was issued by the

---

[25] As the Chapter 13 Trustee testified, after a barebones petition is filed and collection efforts are stayed, it becomes more difficult for counsel to obtain financial information from debtors.

Clerk, indicating a barebones petition.[26] Similarly, all ninety Chapter 13 cases filed by Burton during this period garnered a deficiency notice. Overall, 95% percent of Burton's bankruptcy cases during this time period were begun as barebones petitions.

Burton's barebones petitions cases are also unusual in that so many of them are dismissed due to a failure to tender the missing case documents within the fifteen day extension period. Fifteen of Burton's barebones petitions (11%) were eventually dismissed due to missing documents.

### 3. Repeat Filings

A third unusual aspect of Burton's practice is the number of cases that she refiles for clients after their first bankruptcy is dismissed. In 18 of the 139 cases mentioned above Burton simply refiled the debtor in a second case after the first bankruptcy case was dismissed.

### 4. Fee Practices

During the initial office conference, Burton quotes the prospective debtor a fee for their bankruptcy case. The typical fee includes her attorney's fee, the case filing fee and often a credit-briefing fee. These fees, as well as counsel's fee practices, are memorialized in two pre-printed contracts that

---

[26] Alternatively, the attorney may have unintentionally failed to file certain documents and schedules.

Burton has the client sign: (1) a Legal Services Contract and (2) an Invoice/Receipt.[27]

Most prospective debtors are unable to pay these fees in full. Accordingly, Burton collects as much as the client can afford to pay at the initial conference and contracts for installment payments to cover the rest.

It is not uncommon for bankruptcy attorneys to collect their fees in installments before bankruptcy. However, in a very unusual practice, Burton also collects direct payments from her debtor clients after they enter bankruptcy.

In her Legal Services Contract and the Invoice/Receipt, Burton warns clients about the consequences of failing to make these installment payments. These documents state that nonpayment may result in the attorney withdrawing from their case "at any time" or even in the dismissal of the bankruptcy case.

Burton quotes the prospective debtor a very low fee ($650 to $900, inclusive of filing fees) for their case, as compared to the sums charged by other consumer attorneys. The Invoice/Receipt refers to this as a "flat fee," implying that no further charges will be made. However, from the cases considered at hearing, it is clear that Burton intends to seek additional sums from the debtor after bankruptcy, either from direct

---

[27] At hearing, Burton maintained that these forms were designed for non-bankruptcy services and were employed in specific bankruptcy cases, like Cureton's, by error. This assertion is not credible.

payments and/or their Chapter 13 plans.  Thus, Burton considers
the "flat fee" simply to be an upfront payment, not the entire
case fee.  This distinction is not explained in the
Invoice/Receipt and, consistent with this, the clients who
testified at hearing appeared unaware that their "flat fee" was
not the full fee.

Burton's representation agreements are also unusual as
compared to those of other bankruptcy attorneys. Burton attempts
to exclude several routine bankruptcy services from the legal
representation. Among these excluded services are lien avoidance
motions and the defense of lender relief from stay motions.

### 5. General Competence and Responsiveness Problems

From the start, Burton has experienced many difficulties in
her bankruptcy practice.  Warren Tadlock ("Tadlock"), the
Charlotte Division Chapter 13 Trustee, regularly reviews
Burton's petitions, plans, and other filings at creditors'
meetings and court hearings.

Testifying as an expert witness, Tadlock described[28] Burton
as a below average attorney who, despite having filed well over
a hundred bankruptcy cases, remains generally uninformed about
bankruptcy law. He described how Burton repeatedly makes
careless errors in her clients' cases: failing to include income
in schedules; failing to schedule assets; failing to properly

---

[28] In addition to his general impressions, Tadlock's testimony was based upon
a review of thirty recent Chapter 13 cases filed by Burton.

value assets in the debtors' schedules; failing to disclose client income and expenses, and failing to propose confirmable Chapter 13 plans.

Tadlock and other parties often pointed out these errors to counsel, but even then she usually did not respond. The Trustee noted a lack of urgency by the attorney to correct her mistakes. Further, he says Burton compounds her mistakes by repeating them in subsequent cases.

Supporting his conclusions, Tadlock reviewed in detail three Burton debtor cases not included in the current motions. In each, attorney errors and counsel's subsequent failures to rectify her mistakes caused the debtor clients to lose significant sums of money and/or their bankruptcy discharge.

One case was particularly illustrative. Seeking to save a client's home from foreclosure, Burton filed a Chapter 13 case for Nicole Williams.  See Voluntary Petition Under Chapter 13, Case no. 06-30360 (No. 1), Mar. 12, 2006. However, the case quickly proved unfeasible. Within three months of confirmation, Williams' two secured lenders were seeking permission to foreclose due to missed payments. Within five months, the Trustee was seeking dismissal of the case again due to missed (plan) payments.

Fearing that she would lose her home, Williams opted for a sale of the property. Burton prepared Williams' sale motion, but

failed to include any details about the proposed sale in that document. See Motion to Sell, Case no. 06-30360 (No. 32), June 27, 2007. The Trustee was forced to object. At the hearing, Burton provided the missing information to the Trustee and the sale was approved. Burton then submitted a sale order.

Burton submitted a proposed order that, like her motion, failed to specify the terms of sale (including price, buyer's name, or the disposition of the proceeds). See Order Granting Motion to Sell, Case no. 06-30360 (No. 37), July 11, 2007. It would take counsel another three weeks to amend the order.

This was a "short" sale requiring the second lender's consent. Lack of proof of this consent caused the Trustee to object to the sale. Burton was directed at the hearing to provide evidence of that consent to the Trustee. She did not. Neither order evidenced the lender's consent; nor did the orders specify the dollar amount that the lender had agreed to accept.

Adding to these problems, Williams wanted to claim a partial exemption in the property sale proceeds. However, Burton had not amended Williams' schedules to claim the exemption, and the amended order failed to specify the amount to be exempted. It simply said the debtor to receive "all statutory exemptions in the net sale proceeds."

Finally, while the amended order told the closing attorney to return the net proceeds to the Trustee, it failed to

delineate who (debtor, unsecured creditors, second mortgagee) was to receive these monies. <u>See</u> Amended Order Authorizing Sale of Real Property, Case no. 06-30360 (No. 38), July 23, 2007. These problems caused lengthy delays in the closing, even as Williams' lenders moved towards foreclosure.

However, eventually the sale closed. The closing attorney remitted the net proceeds ($21,851.91) to the Chapter 13 Trustee. Again, the Trustee sought confirmation from Burton of the second lender's consent to sale. He also encouraged her to file her client's exemption amendment so she could claim some of these monies.

Instead, Burton voluntarily dismissed her client's bankruptcy case, thereby stranding the sale proceeds. The Trustee held a pot of money subject to several potentially competing claims,[29] but with no bankruptcy case by which to determine their entitlement.

The Trustee again called Burton and again encouraged her to seek reinstatement of the case and to claim these monies for her client. Still, counsel did not act. Finally, the Trustee asked for instructions from the Court. <u>See</u> Motion of Trustee for Instructions Regarding Entitlement to Proceeds from Sale, Case No. 06-30360 (No. 45), Sept. 20, 2007. It would take several more hearings and four months to get Burton to file the

---

[29] Arguably, the debtor, unsecured creditors or even the second lender had a claim to these monies.

necessary motion. <u>See</u> Motion to Vacate/Set Aside/Rescind Order of Dismissal, Case no. 06-30360 (No. 52), Jan. 14, 2008.

Due to these lengthy delays and counsel's failure to provide the Trustee with information, reinstatement was denied. The sale proceeds were ordered to be disbursed to unsecured creditors. The debtor lost $7,000 in exemptions. Worse, due to the voluntary dismissal, Williams did not even receive a discharge.[30] <u>See</u> Order Directing Disbursement of Sale Proceeds by Trustee and Denying Motion to Vacate/Set Aside/Rescind Order of Dismissal, Case No. 06-30360 (No. 57), Mar. 6, 2008.

### M. Burton's Alcoholism and Treatment

Seeking to excuse her conduct in these cases, Burton testified that she was suffering from alcohol dependency during the period when many of these matters occurred.

Counsel first sought help for her problem in early December 2007, when she contacted the head of a local bar organization that works with attorneys who have substance abuse problems. He urged Burton to seek treatment. She delayed, but later voluntarily entered an in-residence alcohol treatment program on February 29, 2008. This was a month long program, and Burton was there through March 29, 2008.  Counsel says she returned to work on April 8-9, 2008.

---

[30] While Williams was not able to complete a Chapter 13 plan, Burton could have easily converted her case to Chapter 7.

As of the last hearing date, Burton was still participating in a post-treatment maintenance program. She testified that she was not drinking and was progressing with her recovery.

### DISCUSSION

This is a disappointing case of an attorney operating a law practice outside the bounds of applicable law; a court's Local Rules; the North Carolina Rules of Professional Conduct; and in total disregard for her clients' best interests. Although too numerous to be individually discussed, these misdeeds are addressed by general topic, with examples provided.

### I.   Misleading Advertising

Burton targets consumers who are in dire financial straits, such as those facing foreclosure or repossession threats. She recruits them by direct mail solicitation letters.

Attorneys are permitted to advertise (Rules of Professional Conduct of North Carolina ("RPC") 7.2(a)) in this manner; however, they may not make false or misleading statements about their services. RULES OF PROF'L CONDUCT OF N.C. 7.1(a).

A communication can be misleading because it contains a material misrepresentation; omits a necessary fact; or by creates unjustified expectations about achievable results. See id. Even a truthful statement can be misleading if it omits necessary facts or is substantially likely to lead a reasonable person to formulate a specific conclusion about the lawyer or

the lawyer's services for which there is no reasonable factual
foundation.   See id. at cmt. 2.   Similarly, truthful
advertisements reporting a lawyer's achievements on behalf of
clients may be misleading if presented in a manner that leads a
reasonable person to form an unjustified expectation that the
same results could be obtained for other clients in similar
matters without reference to the specific factual and legal
circumstances of each client's case. See id. at cmt. 3.

Burton's solicitations run afoul of these rules due to
their bold promises to save the homes of foreclosure borrowers.
In her form letter Burton promises, "Save your house immediately
w/o paying a lot of money." She further represents to the
homeowner that "[i]n the vast majority of cases, I can help you
save your home." And she confidently represents, that
"[r]egardless of your present mortgage situation, I will be able
to assist you." See Cureton letter, Omnibus Objection Hearing;
Ex. R1.

These representations omit several important facts and
create unjustified expectations about achievable results.   Left
unsaid in Burton's letter is an important financial reality: A
borrower can save his home via bankruptcy only if he has the
ability to pay his ongoing living expenses, mortgage payments,
and a plan payment that includes a mortgage cure payment and
attorney's fees.   Most foreclosure borrowers lack this financial

ability and, thus, are not able to avert foreclosure even with bankruptcy help.

Saving the client's home is an even taller order for Burton's clients. From the cases reviewed at hearing, we see Burton routinely filing Chapter 13 cases for individuals who have no real ability to pay. Given this, and counsel's propensity not to complete petitions and not to actively represent her clients in these cases, Burton's debtors often lose their homes.

In the same vein, Burton's representation that borrowers can save their houses, "without paying a lot of money," is also grossly inaccurate, especially from the perspective of a borrower in foreclosure. Between filing and attorney's fees, a Chapter 13 bankruptcy case costs more than $3,500 exclusive of mortgage payments, arrearage cures, plan payments, and Trustee's commissions. Contrary to counsel's representation, the bankruptcy cases she files for her clients require a great deal of money over a long (3-5 year) period of time.

**II. SCOPE OF REPRESENTATION AND WITHDRAWAL: VIOLATIONS OF COURT RULES AND MISREPRESENTATIONS MADE TO CLIENTS**

A. Counsel's Attempts to Redefine Representation Obligations and Conditions of Withdrawal

Burton targets foreclosure borrowers and quotes low fees to potential debtors, but to make the case pay she reduces the services she provides to clients.

One means to this end is Burton's attempt to limit the scope of the representation. In her client contracts, counsel purports to exclude certain key services from the case representation. For example, counsel disclaims any duty to file lien avoidances for her clients. Similarly, she excludes any obligation to defend their creditor relief from stay motions.

A second tactic is making extensive, almost exclusive, use of barebones petitions while simultaneously taking post-petition payments from the debtor.  This practice allows Burton to minimize the legal work required to initiate a case. Then with the Stay in effect, an additional fifteen days is obtained to complete the petition and to secure additional funds from the client.

A third tactic necessary to make Burton's cases cost effective is her willingness to abandon the debtor's case at any point.  As these cases reveal, Burton ceases work when the case's ability to survive appears weak; when attending a hearing is inconvenient; or when the client fails to make additional payments.

Sometimes this abandonment occurs before the case is filed, as in Cureton's situation.  Sometimes it happens after the barebones petition is filed but before the missing schedules and other documents are filed. This accounts for the abnormally large number of Burton cases where debtors were dismissed due to

filing deficiencies. In a final group of cases, counsel's de facto withdrawal occurs later in the case. Examples include, Burton's failure to file McDougle's lien avoidance motion, failure to respond to the dismissal motion in his case, or the failure to respond to relief from stay motions in the Hernandez or Peete cases.

However, if the client later brings in more money, Burton is again willing to help. Her refilings of dismissed cases reflect this tendency.

In short, Burton's business model appears to be: find clients in dire straits; collect whatever she can; whenever she can; and then to give those clients only as much representation as they can pay for (and often less). When the client's money runs out, so does the representation. Worse, the client is abandoned without prior notice and without court approval.[31]

There is plenty wrong with this method of practicing bankruptcy law.

## B. Local Rules Defining Scope of Retention

Attorneys in this judicial district are retained for the entire bankruptcy case. With few exceptions, debtors' attorneys are obliged to represent their client until either (1) the case

---

[31] On this record, it appears most of counsel's failures to act on behalf of her clients were intentional, but the alternative conclusion is just as damning. Although less common, counsel's failure to act could simply be due to a lack of diligence, meaning malpractice.

is closed or (2) the attorney is permitted to withdraw by order, after motion and notice. Local Rule 2091-1.

An attorney is not at liberty to redefine the bankruptcy representation to exclude particular services such as Burton has sought to do. The lien avoidance motions and relief from stay defenses that Burton contractually seeks to exclude from the representation are essential legal services and are required by Local Rule. In Chapter 13 cases, these services are expressly included as part of the attorney's base case fee. Local Rule 2016-1.

Local Rule 2091-1 does not contemplate cafeteria plans or unbundling services in consumer cases. The Local Rule certainly does not permit extortion by not filing case documents until payments are made or failing to respond motions.

C. Local Rules Establish Conditions of Withdrawal from Case Representation

This brings into focus a related and equally unsavory practice. In her client fee agreements, Burton tells her clients that she can withdraw from their cases at any time if they fail to pay her fees.   In practice, Burton affords herself even more latitude.

Burton's abandonment practices amount to an exclusion of services anytime she is dissatisfied with the state of payments or whenever it is inconvenient for her to perform. Examples include counsel's multiple failures to: represent her clients at

hearings and creditor meetings; file responses to trustee or
creditor motions; file motions for clients to accomplish needed
goals; or tender orders after hearings.

As noted above, Local Rule 2091-1 requires the lawyer to
represent the debtor throughout the bankruptcy case unless
permitted to withdraw upon application, notice and an order.
Withdrawal by inaction is unacceptable and a sanctionable event.
See In re DeSantis, 395 B.R. 162, 2008 WL 4542881 (Bankr. M.D.
Fla. 2008)(stating attorneys' failure to represent client in
reaffirmation agreement proceedings constitutes failure to
represent).

D. Ethics Violations Stemming from Counsel's Attempts to
Redefine Scope of Services and Withdrawal Conditions

In addition to violating this Court's Local Rules, Burton's
service limitations and withdrawal practices violate State Bar
ethics rules.[32]

Attorneys are responsible for providing their clients with
accurate descriptions of the services to be rendered and the
limitations on the representation. RPC Rule 1.5(b) directs that
a lawyer who has not regularly represented a client must
disclose the scope of the representation.  Further, the basis or
rate of the fee and expenses for which the client will be
responsible shall be communicated to the client, preferably in

---

[32] Local Rule 2090-3 makes the RPC, as adopted by the North Carolina Supreme
Court, applicable to attorneys appearing before this Court.

writing, before or within a reasonable time after commencing the representation.

Contrary to these requirements, Burton's clients were not made aware that the fee quoted by counsel for handling their bankruptcy case was not the whole fee. Nor were they informed that Burton intended to seek additional sums from their plan payments. Instead, counsel's printed invoices speak of this fee arrangement as a "flat" fee, implying that this sum was all that was to be paid to counsel.

The fee and withdrawal provisions contained in this attorney's invoices and client agreements do not conform with applicable bankruptcy fee requirements. Misrepresentations to clients were made about counsel's scope of services; counsel's unilateral ability to withdraw if not paid; and counsel's threat of case dismissal if the attorney is not paid. All are false or misleading statements that violate RPC Rule 8.4's counsel's duty of honesty to the client. Finally, several clients were asked to sign, but were not given copies of, their fee contracts and invoices, violating RPC 1.05(b).

Then there are counsel's multiple failures to protect her clients' interests. These practices violate RPC Rule 8.4's requirement that attorneys dutifully represent the client and refrain from conduct prejudicial to their interests.

Burton's repeated abandonment of her clients' cases without notice also violates RPC Rule 1.16. That Rule prohibits withdrawal by counsel if it would have a material adverse effect on the interests of the client. RULES OF PROF'L CONDUCT OF N.C. 1.16(B)(1). These self-determined withdrawals also violate RPC Rule 1.16(c), which requires a lawyer to comply with applicable law requiring notice to or permission of a tribunal when terminating a representation.

### III. Improperly Collecting Fees from Clients after Bankruptcy

#### A. Section 362 Stay Violations

Perhaps the best-known bankruptcy law is the automatic stay. Under section 362 (a)(6) creditors are prohibited from:

> any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title. 11 U.S.C. § (a)(6).

For debtors' attorneys, the Stay has been held to prohibit collections from a debtor after bankruptcy for debt relating to the preparation of the petition and other routine case services. See In re Shell, 312 B.R. 431, 435 (Bankr. M.D. Ala. 2004) (citing 11 U.S.C. §362; In re Briskey, 258 B.R. 473 (Bankr. M.D. Ala. 2001)). This is the longstanding rule in this judicial district. See In re Newkirk, 297 B.R. 457, 461 (Bankr. W.D.N.C. 2002) (stating that an attorney may not collect fees for routine Chapter 7 services from a debtor after the case is filed.)

66

Due to the automatic stay, if a debtor's check is to be taken by counsel in payment for such services, that check must be deposited and must clear before the case is filed. Otherwise, the act of honoring the check will affect a prohibited post petition transfer of estate property. See 11 U.S.C. §549.

The effects of the Stay on debt collection activities are matters of common knowledge among bankruptcy attorneys. Nevertheless, Burton routinely violates these laws as a routine part of her practice. As exemplified by the Peete, Scott and Hernandez cases, counsel's fee agreements unabashedly contemplated payments beyond the petition date.

Further, where the client failed to pay on his own, Burton actively sought to collect these fees by sending invoices to debtors and calling them about sums owed. She collected $200 from the Scotts weeks into the case, even as that case was about to be dismissed for filing deficiencies.    On the cusp of their filing, Burton accepted a post-dated check from the Silvas that could not possibly clear, and possibly was not presented to the bank before bankruptcy. When the check bounced, Burton took matters a step further by calling her debtor and securing the client's agreement to replace the check with cash.[33]

---

[33] Because that check was post-dated, Burton made herself one of the Silva's creditor, an impermissible conflict of interest. An attorney's acceptance of post-dated checks from a client gives rise to a credit transaction between the two parties. In re Newkirk, 297 B.R. at 460.

Had another creditor attempted similar collection measures, it is all but certain that Burton would have responded to their action with a sanctions motion. However, when it comes to debts owed to herself, Burton has appropriated to herself the right to violate her clients' bankruptcy protections.

B.   Violations of Chapter 13 Fee Procedures

Counsel's post-petition fee collection also violated this district's Chapter 13 attorney fee procedures. Western North Carolina, like most bankruptcy courts, employs a mandatory Chapter 13 attorney compensation system. See FED. R. BANKR. PROC. 2016 and Local Rule 2016-1.   A "no-look" attorney fee, currently $3,250, has been prescribed by Local Rule for representing a debtor in a Chapter 13 case.   Absent a Rule 2016-1 application and an order, an attorney is not at liberty to charge sums in excess of this presumptive fee amount.

As to the collection of these base fees, debtor's counsel is at liberty to require any portion of the presumptive fee from the client before filing the bankruptcy case.   Whatever unpaid balance remains afterward, however, must be placed in the debtor's plan and repaid under the plan and with supervision by the Chapter 13 Trustee. Id. Direct collections from a debtor such as Burton has sought are not permitted.

There is more. As discussed above, in many of the reviewed cases, the attorney contracts for a very low "flat" fee with the

client and then applies for a much higher presumptive fee in the
Chapter 13 case. In Peete's case, Burton either attempted to
collect a presumptive fee of $3,200 or, if Peete's testimony is
correct, a greater and not fully undisclosed amount. To that
extent, Burton may have violated Local Rule 2016-1's prohibition
of compensation in excess of the district base fee. She would
also have violated RPC Rule 1.5(a), which stipulates that "[a]
lawyer shall not make an agreement for, charge, or collect an
illegal or clearly excessive fee or charge or collect a clearly
excessive amount for expenses."

Of course, we are not entirely sure what Burton collected
in Peete's case since her account of these payments received
differs from her client's. However, this disagreement points out
a danger implicit in her fee practices. Where a lawyer's
compensation arrangements are not set out entirely and
accurately in the bankruptcy petition or where post-petition
collections are sought by counsel on pre-petition obligations,
it is impossible for the Trustee or the court to supervise these
matters or enforce applicable law.

C.   Ignorance of the Law is Not an Excuse

Burton freely admits to these Stay violations, but claims
that they were isolated actions taken in ignorance of the law.
Her testimony is both disingenuous and unconvincing. First,
contrary to counsel's assertion, her clients' testimony and her

69

own fee documents clearly demonstrate that Burton made a practice of collecting direct payment from her debtor clients after bankruptcy.

Second, even if ignorance of the law propelled her actions, this fact would not excuse her misconduct. These collection activities relate to the automatic stay, a fundamental precept of the legal area (bankruptcy) in which Burton practices. If Burton did not realize she was violating the Stay and this Court's fee procedures, it only means that she is so unknowledgeable about bankruptcy law that she is incompetent to practice in this area.

### IV.   Filing Petitions in Bad Faith

#### A.   Legal Authorities

In <u>Carolin Corp. v. Miller</u>, the Fourth Circuit recognized a good faith requirement for all petitioners seeking relief in the bankruptcy courts. <u>Carolin Corp. v. Miller</u>, 886 F.2d 693, 698 (4th Cir. 1989) (citing <u>In re</u> Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985)). This good faith requirement protects "the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., ...discharge of debts) available only to those debtors and creditors with 'clean hands.'" <u>Id</u>. (citing <u>In re</u> Little Creek Development Co., 779 F.2d 1068, 1072 (5th Cir. 1986)).

This good faith principle extends to all levels of the Bankruptcy Code. The legislative history to the Bankruptcy Code, clearly stipulates that relief is reserved to "honest, but unfortunate debtors." 146 CONG. REC. S167-05, 2000 WL 121382 (Feb. 1, 2000) (statement of Rep. Levin). To that end, bankruptcy courts "have traditionally drawn upon their powers of equity to prevent abuse of the bankruptcy process and to ensure that a 'case be commenced in good faith to reflect the intended policies of the Code.'" See Kestell v. Kestell (In re Kestell), 99 F.3d 146, 147 (4th Cir. 1996).

In addition, several bankruptcy statutes and rules penalize those who file petitions and case documents in bad faith.

Bankruptcy Rule 9011 makes every petition, pleading, and written motion signed by an attorney his or her representation that:

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claim, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; and
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. See FED. R. BANKR. PROC. 9011. [34]

---

[34] The twenty-one day safe harbor to withdraw an offending document is inapplicable to the filing of a petition in violation of the Rule 9011(b) certifications. See FED. R. BANKR. PROC. 9011(c)(1)(A).

Second, for above median debtor Chapter 7 cases,[35] attorneys certify by their signatures on the petition, pleadings or motions attorneys that they have:

> (1) performed a reasonable investigation into the circumstances giving rise to the petition, pleading or written motion; and

> (2) determined that the petition, pleading, or written motion is (i) well grounded in fact; and (ii) is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and does not constitute abuse under paragraph (1). 11 U.S.C. § 707(b)(4)(C).

Third, section 707(b)(4)(D) stipulates that by signing the petition, the attorney warrants that he or she has no knowledge after an inquiry that the information in the schedules filed with such petition is incorrect.

Fourth, section 1325(a)(3) demands that Chapter 13 plans be proposed in good faith.  11 U.S.C. §1325(a)(3).

Fifth, 28 U.S.C § 1927 contemplates assessment of attorney fees and costs against an attorney or other person who multiplies proceedings unreasonably and vexatiously.

The cases before the Court feature a number of violations of these authorities.

B. Bad Faith Case Filings

As noted, Burton's practice is focused upon blocking mortgage foreclosures and vehicle repossessions by filing the

---

[35] Chapter 7 cases in which the debtor has primarily consumer debts and an above median income.

borrower in bankruptcy.  The ability to stay collection actions by filing bankruptcy is a central tool of the bankruptcy system. If the bankruptcy case itself is meritorious, there is nothing improper about filing to avert foreclosure.

Most of Burton's Chapter 13 clients lacked the financial ability to make mortgage payments going forward, much less to cure the mortgage arrearage.[36] Her Chapter 13 debtors, like Peete, McDougle and the Silvas were, at best, marginal prospects and, at worst, hopeless cases.

Filing such cases are neither to the advantage of the debtor nor the lender. While the borrower gains a few more months in the home, he soon loses possession and is out the costs of the case. Further, the extended time comes at the cost of the lender who generally is not paid during the bankruptcy period, and who thereafter must bear the costs of reinstituting foreclosure. In the end, it is only counsel (who makes a living by these fruitless exercises) profits from untenable cases.

Filing bankruptcy cases to delay or avoid foreclosure violates the <u>Carolin</u> good faith standard and is a sanctionable act under Bankruptcy Rule 9011. <u>In re</u> Weiss, 111 F.3d. 1159 (4th Cir. 1997); In re Gordon, 2008 WL 2901583 (Bankr. D. Md. 2008).

---

[36] The client hopes to keep the home, so selling the property is not usually contemplated.

C.   Refiling Dismissed Cases

If filing a hopeless case is improper, refiling that case after dismissal without a change in circumstances is even more reprehensible. However, this too is a feature of Burton's law practice.   In an amazing thirteen percent of her dismissed cases, and without regard to the Court's order that the case be dismissed, counsel simply put the client back in line and started the process anew.   Worse, the evidence suggests that Burton uses such case refilings as a part of her "do as much as you pay for" style of practice and to cover her failures to act on behalf of her clients.

The Ross case provides a good example of this tendency. Burton put Ross in Chapter 13 on January 24, 2006. The aim was to save her car, which is subject to a secured loan. By September 2007, both plan payments and an agreed catch up had failed. Judge Hodges ordered Ross to drive the vehicle to the lender's place of business and to turn it over. See Order Granting Motion for Relief from Stay, Case no 06-40024 (No. 33), Sept. 11, 2007.

Instead of complying, Burton took a voluntary dismissal of Ross' case on October 8, 2007. Ten days later, she refiled Ross in a new Chapter 13, triggering a new Stay. Despite her client's failure to meet her payment obligations in the first case and despite the judge's turnover order, Burton used the new case to

start over. The plan she filed for Ross brazenly devalues the
vehicle and reduces the secured debt from that adopted in the
first case. Effectively, the lender was penalized for the time
in the first case when Burton's debtor was not making payments.
See Chapter 13 Plan, Case no. 07-40598 (No. 8), Nov. 6, 2007.

As a second example, McDougle's first case was dismissed
due to Burton's failures to (1) file his lien avoidance motions
and (2) propose a confirmable plan. Undeterred, Burton
immediately refiled his case with no change in circumstance.
This second case was similarly dismissed due to counsel's
failure to attend the creditors' meetings.

A second case may be filed in good faith, if following
dismissal, a debtor experiences a change in his financial
circumstances, such as the acquisition of a job. However, in
most of counsel's refiled cases, nothing has changed and the
refiling is only an act to delay creditors and to thwart the
court's ruling.  This attorney considers refiling to be a "do
over" tool.

### D. Filing Bankruptcy Cases Without Meeting Filing Prerequisites

1. McDougle

In McDougle's cases, it appears that Burton "took" the pre-
petition creditor briefing, not the debtor. While Burton denies
having taken his briefing, the time and place circumstances

strongly suggest that she did. This act made McDougle ineligible for bankruptcy relief.

Section 109(h) requires individuals contemplating bankruptcy obtain this briefing before filing their case. An attorney may not "take" the briefing for the client. Without having taken the briefing, McDougle was not eligible for relief.

Additionally, counsel caused her client to make a false statement under oath absent this briefing. McDougle's Statement of Compliance with Credit Briefing Requirement[37] expressly certifies that he had received the briefing before bankruptcy. <u>See</u> Official Form 1, Ex. D (10/06).

Even if one accepts Burton's account that somehow, somewhere on September 27, 2007, McDougle used Burton's computer and sat for his briefing under her tutalege,[38] counsel still filed him in bankruptcy at a point in time that she knew him to be legally ineligible.

Section 109(h) is intended to afford prospective debtors information about bankruptcy, the consequences of filing bankruptcy, consideration of alternatives,[39] and at least a one-day "cooling off" period. To that end, section 109 mandates that

---

[37] The Statement of Compliance is signed by an individual debtor and as the official form advises, under penalty of perjury. <u>See</u> Official Form 1, Ex. D.
[38] Obviously, not all of these facts could be true.
[39] <u>See</u> H.R. Rep. No. 109-31(I), at 2 (2005), <u>as reprinted in</u> 2005 U.S.C.C.A.N. 89.

the prospective debtor receive his credit briefing at least one day before the bankruptcy is filed. <u>See</u> 11 U.S.C. §109(h).[40]

McDougle's petition expressly certified that this was the case: "Within the 180 days **before** the filing of my bankruptcy case, I received a briefing from a credit counseling agency..." <u>See</u> Official Form 1, Exhibit D (10/06)(emphasis added).

Even under Burton's account of events, this certification was false. McDougle did not receive a briefing a day or more before the petition. He got it, if at all, less than an hour before he filed. Again McDougle was legally ineligible at the time his petition was filed bankruptcy. Having prepared McDougle's petition, including the Statement of Compliance, Burton was aware that the statutory prerequisites had not been met.

In addition to filing a case in bad faith, Burton caused McDougle to make a false statement to this Court under oath.

2. Scott

Similar to the McDougle situation, the Scotts' Statement of Compliance attested to their having obtained the Credit Briefing before the date of bankruptcy. However, when their certificate was actually filed, it demonstrated that they had not. Confronted with this misrepresentation in the Omnibus Motion,

---

[40] This Court is aware that some courts have held, based upon the legislative history, that this new provision does not require for a day's cooling off period. However, the statutory language is clear and unambiguous and, therefore, resort to legislative history is not warranted.

Burton admitted that her clients had not had the briefing.
However, counsel then sought to blame her clients for the
misrepresentation, disingenuously accusing them of "ginning up"
a certificate.

Again, the evidence suggests that this was not the case.
Burton filed the Scotts' petition without a credit briefing and
misrepresented their status in the Statement of Compliance. They
too were legally ineligible to file.

### V. Misrepresentations to the Court and Other Parties

As officers of the court, attorneys are required to act
with honesty. <u>See In re</u> Armwood, 175 B.R. 779, 789 (Bankr. N.D.
Ga. 1994). Similarly, RPC Rule 8.4 imposes a duty of honesty on
attorneys as well as a duty of candor to a tribunal.

Obviously, the McDougle and Scott section 109(h)
certifications were intentional misrepresentations to the Court
and a fraud on creditors. However, these are not the only false
representations made by counsel in her cases.

### A. Peete's Employment Status

In Peete's case, counsel's willingness to make or cause her
clients to make, false representations was extended to Court
officials. At Peete's creditors' meeting, and knowing that his
employment was necessary to plan confirmation, Burton instructed
her client not to tell the Trustee that he had lost his job.

When Peete was directly asked about his employment status, Burton then permitted her client to perjure himself.

Burton claims to have been surprised when Peete told her that he had lost his job. Not knowing what to do, counsel says she told her client not to volunteer this information. However, Burton steadfastly maintains that she never counseled Peete to lie.

This self-serving account is more an attempt to minimize counsel's culpability than it is an explanation. In any event, it draws a distinction that is itself without meaning. As any attorney knows, an affirmative statement is not necessary to create a misrepresentation. Where there is a duty to speak, silence can also be a misrepresentation. See Simaan, Inc. v. BP Prod. N. Am., 2005 WL 1114344, at *7 (M.D.N.C. 2005).

As to any surprise, an officer of the Court should not require a cool head in order to tell the truth. And even if surprised by Peete's announcement, Burton still had time to consider this new information before the creditors' meeting began. Counsel certainly had time to set matters right when the Trustee asked Peete about his employment status. And of course, she could have corrected his false statement after the creditors' meeting.

Unfortunately, she did none of these things. Rather, counsel caused her client to lie about his job status under

oath.  Because  Peete's  employment  and  income  were  necessary
prerequisites  to  Chapter  13  relief,  this  was  a  material
misstatement.  Burton  used  his  misstatement  to  obtain
confirmation  of  a  plan  that  Peete  had  no  ability  to  maintain.
And  then  she  concealed  the  falsehood.

A  party  who  knowingly  and  fraudulently  who  make  a  false
oath  in  connection  with  a  bankruptcy  case  has  committed  a
felony.  18  U.S.C.  §152(2);  See  also  18  U.S.C.  §157.
Additionally,  suborning  perjury  is  a  crime  in  North  Carolina.
N.C. GEN. STAT. §14-210 (1994). It is also a serious infraction of
state  ethics  rules.  Under  RPC  Rule  1.2(d),  an  attorney  may  not
counsel  a  client  to  engage,  or  assist  a  client,  in  conduct  that
the  lawyer  knows  is  criminal  or  fraudulent.

B.    Other False Statements in Petitions and Schedules

The  McDougle  and  Peete  statements  are  the  most  egregious
misrepresentations  found  in  these  cases,  but  they  are  not  the
only  ones.

In  preparing  this  decision,  the  Court  compared  the  evidence
presented  at  hearing  with  that  contained  in  the  petitions  and
the  schedules  Burton  prepared  and  filed  for  her  clients.  There
are  a  number  of  discrepancies  between  the  two  evidentiary
sources.

The  reporting  of  attorney's  fees  is  a  good  example.    In
McDougle's  first  case  the  petition  states  that  Burton  was  paid

$650 on September 25, 2007. See Statement of Financial Affairs, n.9, Case No. 07-31910 (No. 8), Oct. 15, 2007; Attorneys Fee Disclosure, Case No. 07-31910 (No. 8), Oct. 15, 2007.   In contrast, at hearing Burton testified to receiving a series of payments from her client, $500 on September 15, 2007; $225 a week later, and $233 on September 25, 2007. Putting aside McDougle's statement that he paid Burton even more ($230 on 4-5 occasions, including post-petition payments), the petition and testimony conflict about the number, dates, and amounts of those fee payments.

These discrepancies are repeated in McDougle's second case. On this occasion, listing all fees received from her debtor within a year counsel again discloses a single payment of $650. However, this petition says that the payment occurred on September 27, 2007, two days later than reported in the first case. See Statement of Financial Affairs, n.9 (Case No. 08-30199 (No. 6), Feb. 22, 2008.

Then in Peete's petition, Burton discloses a single fee payment of $650, said to have been made on October 16, 2007. In actuality Peete paid Burton a $200 upfront payment and then made a series of installment payments (including post-petition payments) totaling $900.   Or if one adopts Burton's testimony, Peete paid her $400 on October 18, 2007, plus $558 on November

7, 2007, for a total of $958. Again the dates and amounts do not add up.

Finally, the Silvas' Statement of Financial Affairs and the Attorneys Fee Disclosure indicate that Burton was paid a fee of $600 on the filing date, October 11, 2006. Burton had originally quoted the case to the Silva's at $650. The Silvas paid this slightly higher sum on the filing date. However, $350 of that amount was tendered by a post-dated check, which bounced. Accordingly, on the date the Statement of Financial Affairs was filed (October 26, 2006) counsel had to know the fee amount stated in the Statement of Financial Affairs was incorrect. Burton did not receive her "make good" payment until the creditors' meeting, forty days after bankruptcy.

If individually some of these discrepancies seem minor, collectively they reveal a reckless indifference to bankruptcy disclosure requirements. This lack of accurate disclosure is of even greater concern given the other problems concerning her fee practices: Undisclosed fee arrangements with debtors; misrepresented flat fees; post-petition fee payments; and continued indifference to the truth to her clients and the Court.

C. Sanctions Are in Order for Repeatedly Filing Inaccurate Petitions and Case Documents

Bankruptcy petitions and schedules are lengthy detailed documents so it is easy to make a mistake or two. Similarly,

clients sometimes fail to provide accurate information for these petitions. Although BAPCPA has placed greater responsibility on attorneys to insure the accuracy of their clients' petition documents, (See In re McKlain, 325 B.R. 842, 851 (Bankr. D. Neb. 2005)), under existing law, making an isolated error in a bankruptcy petition, statement or schedules is not a sanctionable offense.[41]

That said, where the attorney repeatedly files inaccurate or misleading petitions, sanctions are in order. See In re Light, 357 B.R. 23, 30-31 (Bankr. N.D.N.Y. 2006); see also In re Rainwater, 124 B.R. 133, 135-36 (Bankr. M.D. Ga. 1991). Other parties and the Court must rely on the information in the filings.

In the current cases, we have any number of errors across several clients' petitions and including statements that the attorney knew to be incorrect. This is consistent with the Chapter 13 Trustee's observations that repetitive and avoidable errors were part and parcel of this attorney's bankruptcy practice.

---

[41] The call becomes closer where the information in those filed documents for example, the Attorney's Fee Disclosure or Response 9 on the Statement of Financial Affairs) is provided by the attorney or is actually the attorney's representation.

### VI. Systematic Malpractice

In addition to intentional acts, these cases are replete with instances of shoddy attorney work occasioned by a lack of understanding about bankruptcy law or of diligence.

### A. Lack of Knowledge of Bankruptcy Law

In this group we see cases either filed in the wrong bankruptcy chapter (Peete; Hernandez) and those where plans were proposed and revised but could not be confirmed or were doomed to failure because they were untenable (Williams; Silva). Burton's case filings draw many more deficiency notices and require more continuances of the creditors' first meetings than is normal.

Burton's testimony further reflects this lack of knowledge. The Administrator questioned counsel at length about aspects of her practice that either violated bankruptcy laws or Local Rule provisions. These violations include her fee practices, contract provisions, piecemeal case filings, and other aspects of her practice.

Burton's response to many of the questions posed was simply that she did not know her conduct was inappropriate. This, no doubt was true in some instances, although not all of these cases. However, even where the root cause of counsel's improper act, ignorance of the law is not an excuse:

> Attorneys are officers of the court, as well as
> professionals. As such, they are held to a high

standard regarding their knowledge of Court Rules and
Administrative Procedures. In the absence, therefore,
of very extenuating circumstances, an attorney may not
plead ignorance to procedural rules. In re Koliba, 338
B.R. 48, 50 (Bankr. N.D. Ohio 2006)

After four years of practicing in this subject area, if
Burton is still unknowledgeable about bankruptcy law, it is no
one's fault but her own.

B. Lack of Diligence

While counsel has a difficult understanding of bankruptcy
law and legal ethics, more troubling is the fact that (a) she
does not appear interested in learning and (b) even when she
knows what is expected of her, she often does not do it.

Tadlock's observations are especially troubling. As
Trustee's go, Tadlock is strongly inclined towards coaching
attorneys to correct their mistakes (as opposed to objecting to
their motions). Tadlock and his staff attorney have made
repeated efforts to help Burton correct her mistakes, but to no
positive effect. Counsel continues to make the same errors, case
after case.

Worse, even when the beneficiary of the Trustee's
gratuitous proctoring, Burton often fails to correct her
mistakes. The Nicole Williams matter brings this point home.
Counsel makes a hash of her client's sale motion, precipitating
a needless hearing. The matter is salvaged at hearing, but
Burton then submits a sale order lacking sufficient detail to

permit a closing.  Weeks pass.  Necessary information (i.e. the lender's consent to sale) is not supplied to the Trustee. The client's exemptions are not amended. Topping all, with the sale proceeds in limbo, counsel intentionally dismisses the bankruptcy case and cannot be persuaded to rectify her mistakes.

This indifference is also reflected in Burton's aborted tutorial meeting with Tadlock.  This meeting was requested by Burton after the Omnibus Motion was filed. No doubt, the request for a meeting was motivated in part by a desire to blunt the Administrator's contention that counsel is unsuitable for practice.

Nevertheless, the Trustee agreed to help. Staff pulled a number of Burton's recent cases.  Tadlock reviewed each case and prepared a summary outline of the problems arising in these cases. He intended to discuss each in detail with Burton. However, Burton then cancelled their conference, without explanation. No effort was made to reschedule.

There are numerous other instances of a lack of diligence seen in these cases. There is the Silva case where Burton could not be bothered to file a motion to substitute collateral. Or Peete's case, where counsel first filed a case which he was not financially equipped; then failed to defend the lender's relief from stay motion; then failed to help him sell his home; and finally, when goaded into action, filed his sale motion so late

that it all but insured a contract default and/or a foreclosure. Additionally, we have cases where petition documents were filed late subjecting the case to dismissal.   There are numerous creditors' meetings and court hearings where counsel failed to attend or to advise her clients that she would not be present.

It is apparent that some part of counsel's diligence problem is organizational. Burton operates a chaotic and understaffed law office.

Common threads Burton's clients' testimony are stories of an unattended office; unanswered telephone calls; unreturned email messages; and a lack of staff to man the phones. Client McCray got a job with Burton just from this circumstance after observing the ringing and unattended phones at Burton's law office.

It is very likely that part of Burton's practice problems are financially driven. Attorneys do not routinely drive to a client's work place to collect fees; nor do they file Chapter 7 cases with so little money in hand.

Finally, some of what Burton does appears to be reactive flailing.   She fails to act in timely fashion and then has to do something else to compensate. Her propensity to refile cases after failing to respond to case motions is an example of this tendency.

RPC Rule 1.5, which requires a lawyer to be competent in the area in which she is practicing and RPC Rule 1.3, which requires that attorney to "act with reasonable diligence and promptness in representing a client."   In addition to constituting bankruptcy rule violations and malpractice, Burton's repeated failures to act on her clients' behalves also violates RPC Rule 1.5.

**VII. Burton's Alcoholism and Subsequent Practice**

Burton blames many of these problems on an alcohol. Having since obtained treatment, and on the assertion that she has improved her practice skills since these hearings began, counsel argues that she has rectified these practice problems.

It is, of course, welcome news that Burton is dealing with her alcoholism.   However, on this record it would be a mistake to assume that these many acts of misconduct are primarily attributable to alcohol, as opposed willful action, sloth or incompetence.

A.   The Record Does Not Demonstrate that Counsel's Misconduct was the Product of her Alcoholism

The evidence concerning counsel's alcohol abuse consists almost entirely of Burton's parole testimony. There is no physician or other expert testimony that would define the extent of her problem or to assess its effects on her practice. Burton's parole testimony certainly does not provide many details.

Counsel testified to having an alcohol problem between Fall 2007 and Spring 2008. Few particulars were provided of how this condition was manifested. For example, we know almost nothing about when she was drinking (at night or throughout the workday) or how much she was drinking. There is almost no evidence to link her drinking to any of the problems associated with her practice.[42] Rather, Burton simply cites alcohol abuse as a blanket explanation for her misconduct, leaving the finder of fact nothing but imagination to determine how that condition caused (if at all) the misconduct seen in the aforementioned cases.

Counsel's assertion is made less credible by the fact that Burton's practice problems date back to the beginning of her practice four years ago.  As the Trustee testified, counsel was making a hash of cases long before the Fall of 2007.  In addition to the cases mentioned by Tadlock, the most striking example of prior misconduct is found in another sanctions order entered against Burton in 2006.

In 2005, Burton electronically filed twenty-one separate bankruptcy petitions without having first obtained the clients' written signatures on the petitions. See In re Aleman, et. al., Case No. 05-35721 (No. 14), Mar. 1, 2006.  Some clients had not even seen these underlying documents. Id.

---

[42] Except for the missed creditors' meeting in March 2008, when she was in treatment.

Because petitions, and several schedules, are signed by the client under penalty of perjury, (28 U.S.C. §1746) an attorney who e-files such petitions without having obtained the clients' signatures has committed forgery. The attorney has also violated Bankruptcy Rule 9011(e) and this District's Local Rules. See Local Rule 5005-1. Counsel must obtain written client signatures in advance of filing and preserve them in the attorney's file for four years after the case is closed.

Given the number and severity of these violations, Burton could have been disbarred. However, in view of counsel's inexperience, this Court imposed a much lesser financial penalty. Burton was advised of the severity of her misconduct; of the potential disbarment sanction, and was urged to seek a mentor to help her learn bankruptcy law.[43] Obviously, that advice went unheeded.

Another indication that counsel's problems go far beyond alcoholism is the fact that these improper actions continued even as Burton began to address her drinking problem and even after she returned from treatment.

When in March 2008, Burton enrolled in a first step program, she knew that she would be out of town and unavailable to her clients for thirty days. Before going, Burton obtained

---

[43] Interestingly, counsel's excuse on that occasion was the same as her present excuse for the fee practices. Although required by both statute and Local Rule, counsel maintained that she did not know that filing petitions and schedules without signatures was a rule violation.

the Administrator's consent to a continuance of these hearings, thereby protecting her personal interests. She was not as considerate of her clients' interests.

Counsel failed to secure a substitute attorney to cover her cases while she was gone. Nor did she advise her clients or other parties to their cases that she would be unavailable for the next month.  Nor did she seek continuances of her clients' hearings and creditors meetings.

Worse, Burton also continued to file bankruptcy cases up to the very day that she left for treatment. A review of the court docket indicates that Burton filed a bankruptcy case for Terence Durham on February 18, 2008, or nine days before she left. The Lisa Anne Sarinelli case, Case no. 08-30394, was filed on February 28, 2008, or one day before counsel left. On her departure date, February 29, 2008, Burton filed both the Ida Gaulden case, Case no. 08-30395, and the Vicky McCathy Fullard case, Case No. 08-30396.

Much of the activity in a bankruptcy case occurs in its first month. Additionally, the most important event in a consumer case is the creditors' meeting.  That meeting by statute must be held within twenty to fifty days after the filing. See Interim Rule 2003(a). Thus, by filing cases up to her departure date, Burton created a strong likelihood that her

clients would need representation but would be unable to obtain it while she was gone.

That in fact proved to be the case, as several of the problems discussed in this opinion arose during the time that she was in treatment and incommunicado.[44]

Finally, that Burton's practice problems extend well beyond alcohol is demonstrated by the fact that they have continued during treatment, after treatment, and after these proceedings and hearings concluded.

As noted, while in treatment Burton failed to appear at creditors' meetings.   After her return from treatment, Burton failed to appear at the creditor meetings held in the cases of McDougle, Houston, and Terrence Durham on March 20, 2008.   Then she failed to appear at their continued meetings on April 8, 2008. The Trustee was not informed that counsel would not be attending these meetings; nor did she obtain a continuance. For their part, the clients also were not notified by counsel that she would be absent.   When they attempted to reach their attorney, were told that Burton was on medical leave.

We now know that Burton was in treatment on March 20, 2008, the date originally set for these creditors' meetings. However,

---

[44] The Sarinelli, Gaulden and Fullard cases were not a part of these hearings. Sarinelli and Gaulden's creditor meetings, like those of McDougle and Durham, were set for on April 2, 2008, in Charlotte, so Burton must not have attended them.   Both had to be continued. Fullard's meeting was set for April 10, 2008, meaning after Burton returned to practice. Counsel was present for it.

on the April 8, 2008 continuance date, Burton was, by her statement, out of treatment. She still failed to appear.

As to post-hearing events, in September 2008, Burton filed a Chapter 7 case for Lakisha Jones Wylie, Case No. 08-31928. Having recently been taken to task for failing to complete barebones petitions, one might expect Burton to mend her ways. She did not. The petition filed for Wylie lacked most of the required case documents: a Summary of Schedules, Schedule I (Income), Schedule J (Expenditures), the Declaration Concerning those Schedules, the Statement of Financial Affairs, the Statement of Income and Means Test, a Statistical Summary of Certain Liabilities, and the Certification of Credit Counseling.

Notice of these filing deficiencies was given to Burton and her client. However, even with a prod and an additional fifteen days, these missing documents were never filed. In the end, Wylie's case was dismissed on October 1, 2008 due to filing deficiencies.

Repeating an old refrain, Wylie's petition, like others filed by Burton before it, represented that the client's credit briefing been obtained before bankruptcy. <u>See</u> Voluntary Petition Under Chapter 7, Case No. 08-31928 (No. 1), Sept. 12, 2008. If true, the certificate should have been available for filing. However, it was never filed either.

Finally, in Wylie we see a wholesale disregard for the client's privacy. Bankruptcy Rule 9037 protects the financial security of debtors by prohibiting disclosure of more than the last four digits of personal identifiers. In Wylie's barebones petition documents, Burton repeatedly listed Wylie's complete financial account numbers. This also earned her a notice from the Clerk. See Court Notice of Defective Filing, Case No. 08-31928 (No. 2), Sept. 15, 2008. Nevertheless, Burton made no effort to amend the petition to correct these errors; nor did she move to seal the filing to protect her client's financial information from disclosure.

Bankruptcy Rule 9037 is a relatively new provision, but this was not Burton's first infraction of the privacy requirement. Back in May 2008, just after Peete's home sale was approved, Burton filed a document in the case reflecting the second lender's consent to the short sale. That document contained both Peete's full account number and his social security number. A notice was issued by the Clerk and served on Burton advising her that her submission violated Rule 9037. Similar to the present situation, Burton never made a motion to seal that pleading; nor did she file a redacted copy of the document.

There is also the recent case of Catherine Cherry. Case No. 06-31441. This Burton debtor voluntarily converted her Chapter

13 case to Chapter 7 on October 31, 2008.  Upon conversion, a debtor is required to file additional petition documents, including a Statement of Intentions and a Rule 1019 Report. Burton filed Cherry's statement of intentions with the conversion notice, but failed to file the Bankruptcy Rule 1019 report. On November 3, 2008, the Clerk issued a deficiency notice pointing out the lapse. The missing document was not filed. Cherry saw her case dismissed due to the deficiency.

The last two cases came to the Court's attention because of questions posed by Clerks office staff. They are mentioned in this opinion solely because of Burton's contention that her practice problems were attributable to ignorance or alcohol and that both problems had been rectified. Certainly, these two factors contributed to Burton's practice problems, but they do not come close to accounting for all of these problems seen in these cases. As the post-hearing cases reflect, those problems have not been resolved.

### B. Alcoholism Does Not Excuse Attorney Misconduct

An attorney does not get a pass to practice law in an irresponsible manner because she has an addiction.  On the contrary, it is entirely unethical for an attorney to represent a client under such circumstances.

RPC Rule 1.16, entitled Declining or Terminating Representation states, in relevant part: "[W]here representation

95

has commenced, [the lawyer] shall withdraw from the representation of a client if: ...(2) the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client."

As the Rule suggests, if Burton had an alcohol problem, it was incumbent upon her to withdraw from the representation. She did not, and her clients have suffered as a result.

### VIII. COURT'S AUTHORITY TO SANCTION AND DISCIPLINE

A.   Sources of Authority

It is well established that a court has the inherent authority to sanction and discipline these attorneys who appear before it. See Chambers v. NASCO, Inc., 501 U.S. 32, 43-44 (1991), Chosin Few, Inc. v. Scott, 209 F.Supp. 2d 593, 602-03 (W.D.N.C. 2002), Byrd v. Hopson, 108 Fed. Appx. 749, 756 (4th Cir. 2004), In re Mercer, 1999 WL 33313831, 7-8 (Bankr. W.D.N.C. 1999), In re Finkelstein, 901 F.2d 1560, 1564 (11th 1990). The practice of law is a privilege and not a right. Sam v. Olah, 225 Ga. 497, 504 (Ga. 1969). That inherent authority extends to suspending or disbarring attorneys. In re Snyder, 472 U.S. 634, 642 (1985).

Further, the bankruptcy court possesses broad authority, pursuant to 11 U.S.C. § 105, to "issue any order ... necessary or appropriate to carry out the provisions of the [Bankruptcy Code]." 11 U.S.C. § 105 (a).

Additionally, both Bankruptcy Rule 9011 and 28 U.S.C. §1927 provide for sanctions against wayward attorneys. As noted, Bankruptcy Rule 9011 treats an attorney's signature on petitions and other case documents as a certification that the documents are not imposed for an improper purpose (such as delay); that they are supported by existing law or a nonfrivolous argument for its extension; and that they have evidentiary support. The Rule provides for sanctions, both monetary and otherwise, against attorneys who violate its tenants. FED. R. BANKR. PROC. 9011(c).

Finally, section 1927 permits an award of attorney fees and costs against an attorney or other person who multiplies the proceeding unreasonably and vexatiously. See 28 U.S.C. §1927.

A court exercises the authority to sanction attorneys with due restraint. When disciplining an attorney, the court must fashion an appropriate sanction without overreaching. Byrd, 108 Fed. Appx. at 756 (quoting U.S. v. Shaffer Equip. Co., 11 F. 3d 450, 461 (4th Cir. 1993)).

Courts should impose the minimum sanction necessary to both protect the public and deter future misconduct. Id.; See also Chosin Few, Inc., 209 F.Supp.2d at 607. To this effect, courts are inclined to discipline a first offense with a lesser sanction and increase the severity of the discipline for any subsequent infractions, while taking into account previous

failed attempts to discipline the attorney. See Mercer, 1999 WL
33313831, at *8.

There appears to be no bright line rule in the Fourth
Circuit for when the sanction of disbarment is mandated. A local
decision, however, is instructive. In Chosin Few, Inc. v. Scott
an attorney violated Rule 11 and the district court's previous
orders. He was barred from appearing in the Western District of
North Carolina until he demonstrated his "willingness to abide
by lawful orders of the court and conduct himself in accordance
with the Rules of Professional Conduct..." Chosin Few, Inc., 209
F.Supp.2d at 608. The Court also ordered that the attorney
disgorge $23,622.38 in attorney's fees and expenses. Id.

B.  Level of Sanctions

Here, we have an attorney whose misdeeds appear in so many
of her cases and in so many different facets of those cases,
that they appear endemic to her practice. These problems stem
from several different sources. Some relate to ignorance of the
law and of counsel's ethical duties. Others stem from willful
behavior and an active disregard of the rules and of the
clients' interests. Still others appear to be the product of an
understaffed and chaotic law office.

Neither prior sanctions, nor threat or more serious
sanctions, nor the well-intended efforts of the Chapter 13
Trustee have had a salutary effect. Rather, these misdeeds

appear to be more commonplace than ever. It is manifestly unfair to other parties and attorneys who practice in a responsible fashion to permit these wayward practices to continue.

As matters stand, Burton is a danger to her existing clients and those individuals who might become her clients in the future. It would be irresponsible for this Court to permit Burton to continue to represent debtors in the manner that she has been practicing.

In light of these factors, the Court concludes that a period of suspension from practice in this Court is necessary. This suspension will be made for an indefinite period, but with a pre-established minimum term. A minimum term will afford counsel time in which to regain control over her life and to take steps to become a competent and ethical practitioner before returning to practice in this forum. An indefinite term will insure that should counsel fail to take these remedial measures, the public will be protected from further abuse and the dignity of this Court will be maintained.

### C.  Malpractice Damages

The Administrator requested at hearing that clients recover damages from Burton akin to those seen in a malpractice case. This relief might well be appropriate if this was a malpractice action and if a demand for such damages had been pled. Instead, we have here a Sanctions Motion containing only a request for

disgorgement of unearned fees and a review of counsel's fitness to practice in this Court.

The sanctions matter, while a serious disciplinary proceeding, is not an adequate substitute for a malpractice suit. See In re Palumbo Family Ltd. P'ship, 182 B.R. 447, 473-74 (Bankr. E.D. Va. 1995); See also Philip White, Jr., Bankruptcy Rule 9011 Sanctions in Chapter 11 Bankruptcy Proceedings, 5 A.L.R. 31, §10 (2005). Further, apart from fees paid to Burton, the clients who testified did not establish calculable damages stemming from Burton's conduct. Certainly, several demonstrated how Burton's conduct caused them to lose homes or cars, and several clients testified that they incurred other unnecessary expenses as a result. However, no receipts or other proof was offered at trial from which the Court could determine monetary damages. The matter was simply not framed or tried as a malpractice action. The Court, therefore, will **GRANT** the request for fee disgorgement, but **DENY** the request for other monetary damages. This denial is without prejudice to these claims being sought in a subsequent action(s) by the client(s).

It is therefore **ORDERED**:

1. Marcia Burton is suspended from practicing in the U.S. Bankruptcy Court for the Western District of North Carolina for an indefinite period, not less than twelve months.

2.   After that twelve month period, Burton will be eligible for reinstatement, but only if she demonstrates to the satisfaction of this Court that she is able and willing: (a) to represent her clients in a competent and ethical manner, and (b) to abide by the Bankruptcy Code and Rules; this Court's Local Rules; and the North Carolina Revised Rules of Professional Responsibility.

3.   In order to be considered for readmission, Burton must file a written application certifying completion of the following remedial steps:

a.   Twenty (20) hours of continuing legal education accredited by the North Carolina State Bar on topics related to bankruptcy law, including a basic (practical) skills course;

b.   An additional ten (10) hours of continuing legal education accredited by the North Carolina State Bar related to the topic of professional ethics;

c.   Having read the Local Rules of the Bankruptcy Court for the Western District of North Carolina;

d.   Having read the Revised Rules of Professional Responsibility as adopted by North Carolina; and

e. Having continuously abstained from the use of alcohol and other addictive drugs for the twelve (12) month period preceding that application.

4.    Within thirty (30) days, Burton shall provide the Administrator an accounting of all sums collected from the clients named in the Omnibus Motions through the end of these hearings, together with copies of source documents reflecting all client payments and any prior reimbursements made by counsel to the client.

5.    Within thirty (30) days, Burton shall refund to the clients named in these two motions, all attorneys fees previously paid to her by these clients in connection with those cases. When paid, counsel shall evidence her compliance with this order by filing a signed certification of compliance.

6.    A copy of this Order shall be forwarded to the North Carolina State Bar.

**This Order has been signed          United States Bankruptcy Court
electronically.  The judge's
signature and court's seal
appear at the top of the Order.**